NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0350n.06

Nos. 14-2498, 14-2528

**FILED**
Jun 24, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

    v.

RUFUS DEON WILSON and JOHN ROBERT DAVIS,

  Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: SUTTON and GRIFFIN, Circuit Judges; and OLIVER, District Judge.[*]

GRIFFIN, Circuit Judge.

A jury convicted defendants Rufus Wilson and John Davis of conspiring to murder a federal employee, among other crimes. We affirm their convictions because the government introduced sufficient evidence to convict, including that necessary to rebut proof of entrapment, and any error from introducing a confidential informant's recorded statements was harmless. We decline to disturb Wilson's sentence because the district court did not plainly err in sentencing him to life imprisonment and his sentence does not violate the Eighth Amendment.

I.

Lebron Nunn is a convicted felon and experienced confidential informant. In 2012, when his brother Roman Whitfield was charged with various federal crimes, Nunn approached the

---

[*]The Honorable Solomon Oliver, Jr., Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

investigating federal agent, Joseph Nether, to make a deal. Nunn offered to work as a confidential informant if Nether told the prosecutor of Nunn's cooperation. At some point, Nunn informed the agent that Nunn's step-brother, defendant John Davis, trafficked in firearms and narcotics. Nether reviewed Davis's criminal history, which showed prior drug and firearm-related convictions, and encouraged Nunn to attempt to buy guns and drugs from Davis. Shortly thereafter, Davis arranged a sale of stolen firearms to Nunn and, separately, an illegal drug sale.

In 2013, Nunn told Nether that Davis was interested in conducting an armed home invasion of a drug dealer. The agent again reviewed Davis's criminal history and observed that Davis had been convicted of armed home invasion and firearms-related offenses. Nether advised Nunn to set up a meeting between Davis and Nether (undercover) so Nether could present Davis with an opportunity to rob a drug dealer.

The first meeting was on April 23, 2013. This and the following meetings were video and audio recorded. Nether presented the following fictitious scenario: he was a disgruntled drug courier seeking to rob up to 10 kilograms of narcotics from a drug supply house. Nether said there would be at least two armed people inside so he needed "a crew of professionals" to rob the supply house and "didn't want any amateurs[,] just professionals, people that had done this before." Davis said he could do it and would find three accomplices.

Davis left the meeting with Nunn, who was wearing a recording device. Davis suggested that they rob Nether after the drug pick-up instead of going inside the house with armed guards. Later, Davis made several calls to co-defendant Rufus Wilson. The next day, in a recorded phone call to Nunn, Davis said he and Wilson had discussed an alternative to the proposed drug house robbery. Two days later, in another recorded call, Davis said he had been sitting up all night making a plan with Wilson. Then Davis asked Nunn "how [Nunn] [felt] about the ol'

boy," referring to Nether. Nunn said he liked Nether, and Davis expressed disappointment in his voice, responding, "Okay well, alright." Later that day, Davis met Nunn to discuss the robbery. Davis suggested that, instead of going into the drug house, they crash their car into Nether and "[t]ake whatever he got off of him."

Nether, Nunn, and Davis met for a second time on April 26. During the meeting, Davis told Nether that Wilson was "talking 'bout going up in there shootin'" and "going in there [and] lay everybody down." Davis explained that both he and Wilson would be shooting: "[L]isten to me, this is what I'm telling you. We both shooters." As he said this, he made hand gestures as if he was holding two handguns. Davis said he would not hesitate to shoot: "[M]otha fuckers getting twitchin' and moving, [Wilson] ain't gonna, I'm not gonna hesitate." Wilson called Davis midway through the meeting and Davis handed the phone to Nether. Nether later testified that he explained the robbery plan directly to Wilson so he would "have the whole story for himself so he could make his own decision" about participating. Wilson agreed to participate by responding affirmatively at various times, like to Nether's statement, "I mean is this cool to you?," by saying "Oh, yeah it[']s cool" and, "[i]t's a go on this end." After the meeting, Davis told Nunn that they should kill Nether: "That's why I asked you how you feel about the nigga . . . We don't need nothing come back to you, or us . . . . [D]ust they ass off or dust his ass off with 'em."

On April 29, Nether, Nunn, and Davis met again. This time, Wilson attended in person. On the way to the meeting, Nunn picked up Davis. During the ride, Davis said, "me and [Wilson] was talkin . . . he saying it's a risk us going up in that [house] 'cause there ain't no telling . . . ." Davis said he wanted to rob Nether instead: "[R]un straight into his Mother fucker car . . . boom! . . . [A]nd whatever he got on him we steal." Nunn confirmed, "[i]t's

understood. Fuck I told you I'm down, fuck it. We knocking his ass, fuck it, knocking his ass off, fuck it. I'm ready, hear me." Davis responded, "Knock him off, nigga." Then they picked up Wilson. When he got into the car, he said about Nether, "[d]ig what I'm saying, that nigga can't leave. . . . That nigga can't leave man." To keep the robbery quiet, Wilson said, "I want, knives man. I cut all them niggas up. . . . Ain't gotta be no pop, pop, pop, pop, pop . . . . That's how I'm gonna do it." Davis responded, "when it come to this kind of money you got to spill blood. Aint no gentlemen." Wilson observed that if Nether were to leave the scene, "[h]e gonna testify [and then w]e ain't got nothing. This nigga done left the scene, he set us up . . . . That nigga can not leave that scene." Davis repeated his plan to run into Nether's car, "[w]hatever he got, whatever he got on him, we gonna get that . . . . Fuck the house . . . ." Then they discussed taking everything from Nether, "the money he got, the phone, everything." Davis repeated that he wanted to "take his cell phone, when, when he outta there, take everything from him . . . . Take his pants off of him. Leave him in that bitch naked." Just before they met Nether, Davis said they should continue to pretend they were going to rob the drug house as originally proposed by Nether.

At the April 29 meeting, the men discussed wearing tactical gear during the robbery and wrote down their clothing sizes for Nether. After the meeting, Nunn, Davis, and Wilson again talked about killing Nether. Davis said, "He dead. Let's kill his ass." Davis and Wilson observed that if Nether got all ten kilograms, he would abscond with the drugs. Wilson responded, "He gotta die . . . blow his brains out anyway . . . . Blow his brains out."

On May 2, Nether called Davis to make sure everyone was still participating in the robbery, which Davis confirmed. That day, Nunn, Davis, and Wilson met Nether in a parking lot, where Nether asked if they were "still good with everything?" They confirmed by nodding

their heads and stating, "yeah." They followed Nether to a warehouse to get the tactical gear and a van. There, Nether said he would be picking up two kilograms of powder cocaine and one kilogram of crack cocaine. Shortly thereafter, federal agents waiting nearby arrested defendants. As he was arrested, Wilson threw a handgun into a nearby stairwell. The gun was loaded with two rounds of ammunition in the magazine and a hollow-point bullet in the chamber. Trial testimony later established that a hollow-point bullet typically causes more serious wounds to human targets. Wilson also had an 8-inch serrated-blade knife and a knit cap, and was wearing latex gloves. Next to Davis, the agents found latex gloves and a black mask.

The government charged Davis and Wilson with conspiracy to murder an employee of the United States, in violation of 18 U.S.C. §§ 1114, 1117 (Count 3), conspiracy to possess with intent to distribute controlled substances, 21 U.S.C. §§ 841(a), 846 (Count 4), and possession of a firearm in furtherance of a drug trafficking crime and aiding and abetting, 18 U.S.C. §§ 2, 924(c) (Count 5). Additionally, Davis was charged with possession of a firearm as a felon, 18 U.S.C. § 922(g) (Count 1), and attempt to distribute a controlled substance, 21 U.S.C. §§ 841(a), 846 (Count 2). Wilson was also charged with possession of a firearm as a felon, 18 U.S.C. §§ 922(g), 924(e) (Count 6), and possession with intent to distribute controlled substances, 21 U.S.C. § 841(a) (Count 7).[1] A jury convicted defendants on all counts. The district court sentenced Davis to 300 months of imprisonment and Wilson to mandatory life imprisonment.

## II.

In this consolidated appeal, defendants maintain that the government's trial evidence was insufficient to convict, the district court's admission of Nunn's statements through video and

---

[1]While Wilson was detained pending trial, he called his girlfriend about distributing his crack cocaine stored at her house. That is the factual basis for Count 7.

audio recordings contravened the Sixth Amendment's Confrontation Clause, and the district court abused its discretion in allowing the jury to view transcripts of the video and audio recordings. Additionally, Wilson claims the district court erred in sentencing him to life imprisonment.

A.

Most contested is whether the government produced sufficient evidence to overcome defendants' entrapment defenses. Wilson also challenges the sufficiency of the evidence supporting (1) the drug quantity for the conspiracy to possess with intent to distribute controlled substances and (2) his intent to conspire to commit murder.

1.

Defendants first challenge the sufficiency of the government's evidence to rebut their entrapment defenses.[2] At trial, the court instructed the jury on entrapment, but the jury convicted defendants on all counts. "We must affirm a jury's denial of an entrapment defense unless we determine, viewing the evidence in the light most favorable to the government, that no reasonable juror could have concluded beyond a reasonable doubt that the defendant was predisposed to commit the offense." *United States v. Anderson*, 76 F.3d 685, 690 (6th Cir. 1996).

"A valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002). "The government has the burden of proving beyond a reasonable doubt that the defendant was already willing to commit the crime." *Anderson*, 76 F.3d at 689 (citation omitted). "Predisposition, the principal element

---

[2]We need not resolve whether Davis forfeited this claim of error, as suggested by the government, because his argument fails on the merits.

in the defense of entrapment, focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (internal quotation marks and citation omitted); *see also United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984) ("The central inquiry . . . is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so."). Relevant factors for determining predisposition include: (1) "the character or reputation of the defendant, including any prior criminal record," (2) "whether the suggestion of the criminal activity was initially made by the Government," (3) "whether the defendant was engaged in the criminal activity for profit," (4) "whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion," and (5) "the nature of the inducement or persuasion supplied by the government." *Khalil*, 279 F.3d at 365.

Defendants vigorously dispute the first factor—character or reputation. They contend that none of their prior convictions are sufficient in kind or severity to show predisposition. The government argues that a reasonable jury could conclude that defendants' character and reputation weighed in favor of predisposition based on a combination of their (1) prior convictions related to violence, robbery, and drugs, (2) statements related to robbing and killing Nether, and (3) actions consistent with those statements on the day of arrest.

Viewing the evidence in the light most favorable to the government, the first factor supports the government. Davis has prior convictions for home invasion, larceny in a building, and assault with intent to commit bodily harm. At trial, the government presented evidence that Davis had previously shot a man from behind during a neighborhood scuffle and participated in

an armed home invasion during which he or a co-defendant pointed a shotgun at a six-year-old victim. Wilson has convictions for domestic violence, unarmed robbery, and aggravated drug trafficking. Wilson concedes that his convictions are "arguably relevant" but disputes their weight based on date and similarity. Our court has rejected a "narrow" interpretation of the similarity required for a prior conviction to support predisposition for entrapment. "We decline to endorse [a] narrow and hyper-technical view . . . . Predisposition evidence must be based on conduct near enough in kind to support an inference that the defendant's purpose included offenses of the sort charged, although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted." *United States v. Al-Cholan*, 610 F.3d 945, 951 (6th Cir. 2010) (internal quotation marks, alterations, and ellipses omitted). In this case, there is persuasive evidence that both defendants were predisposed to commit violence, robbery, and drug-related offenses. Moreover, their recorded statements describing their self-designed plan to rob and kill Nether, viewed in the government's favor, support that they were predisposed to rob and kill. A reasonable jury could conclude each defendant's character weighs in favor of predisposition. Under our deferential standard of review, that is all that the government must show for a given factor.

The remaining factors weigh in favor of the government or are neutral. The second factor—whether the suggestion of criminal activity was initially made by the government—supports the government. Although the government suggested robbery of a drug house to defendants, defendants admitted in recorded statements that they spent hours (without Nunn) designing their own plan to rob and kill Nether, at least with respect to Counts 3−6 (drug

conspiracy, murder conspiracy, and related firearms charges). Thus, with respect to Counts 3−6, a jury could view this factor in favor of the government.[3]

The third factor—profit—weighs heavily in favor of the government. Davis argues that he never actually made a profit from his criminal activity, and Wilson argues that the "profit was akin to putting food on the table." Neither argument undermines that each defendant was highly motivated by the prospective profit to conspire to distribute drugs and kill Nether (Counts 3−6), evidenced by their repeated mention of profits in the recordings. Moreover, Davis emphasizes the prospect of making a considerable profit to prove inducement. That cuts against him with respect to this factor.

The fourth factor—reluctance to commit the offense—likewise weighs in the government's favor. Defendants were reluctant to risk their lives by entering a drug house with armed guards, so they conspired to rob Nether instead. They never showed reluctance to rob and kill Nether. Quite the opposite, the government played recordings for the jury of defendants expressing enthusiasm for their plan.

Finally, the fifth factor—the nature of the persuasion or inducement by the government—weighs in favor of the government. Inducement requires "something more than merely affording an opportunity or facilities for the commission of the crime." *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011) (alteration omitted). It requires "'an opportunity *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive.'" *United States v.*

---

[3]As to Counts 1 and 2 (Davis's convictions for the drug and gun sales), the government suggested the gun and drug sales (through Nunn). But the only other factor that might weigh in Davis's favor for Counts 1 and 2 is the third factor, profit. Even assuming those two factors weigh in Davis's favor, the remaining factors weigh in the government's favor. As to Count 7 (drug distribution from jail), Wilson does not argue that he was entrapped.

*Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010) (quoting *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994)) (emphasis in original). In other words, the prospect of substantial profit, standing alone, is not inducement. In this case, defendants argue that the government unfairly used their familial ties to Nunn to induce them. (Wilson is Nunn's step-cousin.) Although a jury may have believed defendants were loyal to Nunn, there was competing evidence that could have led the jury to view this factor in the government's favor, such as defendants' continued expression of willingness to commit the offense and Davis's admissions that he "[c]ould have said no" but went along because he was intrigued by the opportunity, and that he continued to go to the meetings with Nunn and Nether because of "the temptation for the amount of drugs that was going to be in there . . . . I'm looking at ten times 40. That's $400,000, and I ain't got $400,000. I'll take a chance on going into [an] empty house, but a house with guys with guns, I don't know."

Ultimately, it is difficult for defendants to show entrapment under the facts of this case: they were presented with one crime (robbing a drug house), but self-designed another (arguably more ruthless) one (conspiracy to murder). The government did not plant in their minds that they should rob and kill Nether. Defendants cite no cases, and we find none, in which a defendant has prevailed on an entrapment defense under similar circumstances. Guided by the aforementioned factors, the government has introduced sufficient evidence to overcome entrapment.

2.

Wilson also challenges the sufficiency of the evidence supporting the drug quantity for Count 4. Wilson's argument is that one of two scenarios was possible, but not both: either he believed that Nether would get the full ten kilograms of drugs or Nether would get just the three

kilograms he mentioned on the day of Wilson's arrest. Thus, Wilson maintains that (1) there was not enough time for him to form a conspiracy as to three kilograms before he was arrested, and (2) allowing for alternative quantities based on mutually exclusive scenarios within a single count creates a variance in the indictment.

We review his first argument de novo, assessing "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We draw "all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013) (internal quotation marks omitted). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015) (citation omitted). "In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).

The jury heard evidence that Nether told defendants he usually picked up one to three kilograms of cocaine at a time and there were typically ten kilograms stored at the supply house. The day of the arrest, Nether told them he would pick up three kilograms of cocaine, including two of powder cocaine and one of crack cocaine. Defendants had already conspired to kill Nether and "[t]ake whatever he got off of him." Nether's statement on the day of the arrest was consistent with his previous representations, and defendants voiced no objections, even though they had consistently hoped they would score more than three kilograms when they robbed him.

A rational jury could therefore find that Wilson conspired to possess with intent to distribute more than one-half kilogram but less than five kilograms of powder cocaine and 280 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a), 846.

Regarding Wilson's second argument, a "variance occurs when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998). "[T]o obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a two-prong test must be satisfied: (1) the variance must be demonstrated; and (2) the variance must affect some substantial right of the defendant." *Id.* "A substantial right is affected only when a defendant proves prejudice to his ability to defend himself or to the overall fairness of the trial." *Id.* In this case, Count 4 of the second superseding indictment charged Wilson with conspiracy to possess with intent to distribute 280 grams or more of crack cocaine and five kilograms or more of powder cocaine (more than the one-half to five kilograms of powder cocaine for which Wilson was ultimately convicted). The jury completed a special verdict form that allowed it to specify the quantity for each drug. *See United States v. Robinson*, 547 F.3d 632, 637, 640 (6th Cir. 2008) (approving the use of a verdict form that requires jurors to specify drug quantities). Consistent with Sixth Circuit Pattern Instruction 14.07A, the district court instructed the jurors that they were permitted to find lesser quantities of drugs than alleged in the indictment, and the jury convicted Wilson of a lesser quantity of powder cocaine. These facts suggest the indictment, evidence, and verdict were consistent and there was no variance. But even if there were a variance, Wilson has no meaningful argument that his ability to defend himself was prejudiced, and he offers none on appeal.

3.

Wilson also asserts that the evidence was insufficient to prove beyond a reasonable doubt that he intended to conspire to murder Nether.[4]  At most, Wilson argues, the evidence supports a conspiracy to rob Nether and leave him stranded but alive.  Regarding various incriminating statements about killing Nether, Wilson argues "he was simply boasting, and in reality had no plan whatsoever."

The recordings of Wilson's statements, taken together with the physical evidence at the scene of arrest, are sufficient for a reasonable jury to conclude Wilson intended to conspire to kill Nether.  Wilson argues the incriminating statements on which the government relies are consistent with a plan to rob Nether and leave him stranded but alive.  The government's theory is that defendants intended to rob Nether but leave him dead.  Thus, the fact that many statements are consistent with Wilson's statement that Nether "can not leave the scene" is unremarkable.  Relevant is whether those statements are so inconsistent with an intent to kill that a reasonable jury could not conclude beyond a reasonable doubt that defendants intended to kill Nether.  In our view, a reasonable jury could interpret Wilson's statements regarding killing Nether as more than merely boastful, and nothing else in the record precludes the reasonable conclusion that Wilson intended to conspire to kill Nether, as opposed to leave him stranded but alive.  This is especially true under our deferential standard of review of sufficiency challenges.

Wilson also asserts that Nunn was the only person who unequivocally spoke of killing Nether.  But the jury heard dozens of recordings.  In the context of all the recordings, a reasonable jury could interpret Wilson's incriminating statements as referring to Nether,

---

[4]We need not decide whether Wilson has preserved this issue because, even if he did, it fails on the merits.

particularly in light of defendants' preoccupation that Nether would flee the scene with the drugs and testify against them.

Finally, Wilson disputes that he ever used the phrases "cut" or "cutting" in reference to Nether. He says that one reference referred to the armed men in the stash house and another to killing a turkey. But regardless of whether Wilson intended to use a knife to "cut" Nether, the jury heard (1) Wilson's statements about "blow[ing Nether's] brains out" in the context of a conversation about how Nether had to die or he would run away with the drugs and (2) evidence that Wilson showed up to the warehouse with a handgun with a hollow-point bullet in the chamber. That evidence is sufficient for a reasonable jury to conclude that Wilson intended to conspire to kill Nether.

B.

Defendants also assert that the introduction of Nunn's recorded statements violated their Sixth Amendment confrontation rights. The government argues that Nunn's statements were not hearsay and any error was harmless. We review de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010).

1.

The Confrontation Clause of the Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI. This Clause "guarantees a defendant's right to confront those who 'bear testimony' against him." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)) (internal quotation marks omitted). "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-

examination." *Id.* "To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay—that is, a 'statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *United States v. Deitz*, 577 F.3d 672, 683 (6th Cir. 2009) (quoting *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007)). "We have held that statements by a confidential informant are 'testimonial' and thus, subject to the Confrontation Clause. However, we have also clarified that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* (internal quotation marks, citation, and brackets omitted).

In this case, defendants objected to the admission of Nunn's statements as hearsay and for their inability to cross-examine him. The district court admitted Nunn's statements as *res gestae*[5] because they provided background and context for defendants' statements in the recordings and granted defendants a standing objection at trial. The record supports that defendants knew that Nunn was the government's confidential informant at least five months before trial. Once the government determined that it would not call Nunn as a witness, the district court ordered the government to provide defendants impeachment evidence about Nunn (such as criminal history) but denied defendants' motion to produce Nunn or disclose his location.

---

[5]The phrase "*res gestae*" "is generally defined as 'the events at issue or others contemporaneous with them.' In the law of evidence, *res gestae* may be either a rule of relevance that makes testimony about the events forming part of the *res gestae* admissible, or an exception to the hearsay rule allowing for the admissibility of *res gestae* (e.g., if they accompany or explain a declarant's contemporaneous state of mind or physical sensations)." Bryan Garner, *Garner's Dictionary of Legal Usage* 777−78 (3d ed. 2011).

The vast majority of Nunn's statements introduced at trial were not offered to prove the truth of the matter asserted. They provided background and context for defendants' incriminating statements and gave meaning to their responses. For example, Davis asked Nunn how he felt about Nether, to which Nunn responded that he liked Nether. Davis's disappointed reaction in his voice as he said, "Okay well, alright," is difficult to understand outside the context of the exchange. Later, Davis referenced this exchange when he suggested they kill Nether: "That's why I asked you how you feel about [Nether] . . . We don't need nothing come back to you, or us . . . . [D]ust they ass off or dust his ass off with them." These were not offered to prove the truth of the matter asserted (i.e. that Nunn actually liked Nether) but to give meaning to Davis's statements.[6]

Beyond *res gestae*, the government had a second, non-hearsay reason for offering Nunn's statements. By presenting an entrapment defense, defendants opened the door to evidence showing that Nunn did not induce defendants. Introducing Nunn's statements alongside defendants' for this purpose is not hearsay.

The district court did admit a few questionable statements.[7] However, we presume the jury followed the district court's instruction that the recordings were only introduced "for the purpose of showing the context . . . not for the truth of what [Nunn said], but for the context." *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 766 & n.8 (1987). Moreover, introduction of these few

---

[6]At trial, Davis withdrew his objection to Exhibit 8, recorded telephone conversations between Davis and Nunn and, separately, Davis and Nether. The government argued at oral argument that Davis withdrew his objections to the use of Nunn's statements for all exhibits, but it appears that Davis merely withdrew his objection to Exhibit 8.

[7]These include Nunn's statements that Wilson and Davis were "more than down [for committing the robbery] matter of fact, ain't about being down, they more than down really," "they wanna hurt people," and "aint no way [Wilson] go in there and let a mother fucker, one person out . . . '[c]ause ya'll trigger happy mother fuckers too."

statements next to defendants' numerous incriminating statements only amounts to harmless error. *See Henderson*, 626 F.3d at 333.[8]

2.

Alternatively, Wilson argues that, even absent a Confrontation Clause violation, the district court's denial of his motion to produce Nunn or disclose his location compromised his ability to present a defense. The government argues that Wilson knew Nunn's identity, the government was not required to disclose Nunn's location, and it is disingenuous of defendants to claim Nunn was "unavailable" as a witness because "defendants took no steps to call [Nunn] as a witness." "We review the district court's decision to deny defendant's motion for compulsory process under an abuse of discretion standard." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992).

---

[8]Wilson briefly argues that Nether's testimony "furthered" any Confrontation Clause violation. Specifically, he argues that Nether "interpreted statements, explained expressions, identified voices, and assigned nicknames in recordings" as he conveyed the government's theory of the case "with the imprimatur of testifying as a law enforcement officer." For support, Wilson cites *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013). But *Freeman* is distinguishable. In *Freeman*, we addressed the extent to which agents may give lay opinion testimony that interprets intercepted conversations "when the agents base their interpretations on the collective knowledge that the agency obtained through the course of the investigation" and explored the "risk that when an agent provides interpretations of recorded conversations based on his knowledge of the entire investigation, the agent could impermissibly testify based upon information not before the jury, including hearsay, and that the jury might think the agent is privy to important knowledge about the case that the jury lacks." *United States v. Kilpatrick*, 798 F.3d 365, 379−80 (6th Cir. 2015) (citing *Freeman*, 730 F.3d at 596−97). The problem in *Freeman* was that the testifying agent "repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole" and "the general knowledge of the FBI" in violation of Federal Rule of Evidence 701, instead of specifying "*personal* experiences that led him to obtain his information." *Id.* (citing *Freeman*, 730 F.3d at 597). In this case, Nether's trial testimony makes clear that he spoke from personal experience. He was the investigating agent from beginning to end of the conspiracy and posed undercover as a co-conspirator. He did not "lack[] the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a)." *Freeman*, 730 F.3d at 597. Therefore, we cannot agree that Nether's testimony transformed a few arguably hearsay statements into anything more than harmless error.

A factually similar case is instructive. In *United States v. Moore*, the district court denied the defendant's motion to produce a confidential informant after he argued that the confidential informant's testimony could substantiate his entrapment defense. *Id.* at 380−81 (citation omitted). Our court explained that the Sixth Amendment "does not . . . require the government to call every witness competent to testify, including special agents or informers. If the evidence upon which a defendant is convicted was secured personally by government agents who testified, the government is not required to produce the cooperating individual." *Id.* at 381. "Further, with respect to compelling production of confidential informants, the Supreme Court has made it clear that 'no fixed rule with respect to disclosure is justifiable.'" *Id.* (quoting *Roviaro v. United States*, 353 U.S. 53, 62 (1957)). "The court must 'balance the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.'" *Id.* (quoting *Roviaro*, 353 U.S. at 62) (brackets omitted). "An informant must be disclosed only upon a showing by the defendant that disclosure is *essential to a fair trial*." *Id.* (citing *United States v. Hanna*, 341 F.2d 906, 907 (6th Cir. 1965)) (emphasis added).

Reviewing for abuse of discretion, the *Moore* court upheld the denial of the motion to compel production because the defendant failed to show how disclosure of the informant would "substantively assist his defense": "He advanced no more than a simple statement that [the informant's] testimony might assist in his [entrapment] defense. . . . [Moreover, in the defendant's] own testimony [he] denied that the [informant] even made the [contested] statement . . . which his counsel asserted the [informant] would describe." *Id.* at 381−82.

In this case, Wilson's request goes one step beyond the defendant's in *Moore*. He argues that although he knew Nunn's identity, the district court erred by failing to require the government to produce Nunn. The burden was on Wilson to show that examining Nunn was "essential to a fair trial." *Id.* at 381 (citing *Hanna*, 341 F.2d at 907). Like the defendant in *Moore* unsuccessfully argued, Wilson contends that examining Nunn would have allowed Wilson to test or substantiate his entrapment defense. But under an abuse-of-discretion standard, the district court's denial of Wilson's request under the case-by-case *Roviaro* framework does not leave "a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Mack*, 159 F.3d 208, 217 (6th Cir. 1998); *see Moore*, 954 F.2d at 381 (the Sixth Amendment "does not . . . require the government to call every witness competent to testify, including special agents or informers").

Alternatively, the government argues that Nunn was not "unavailable" as a witness. Assuming Nunn was available, Wilson cites no authority for the proposition that, where a defendant already knows the informant's identity, the government is required to disclose the informant's location. "Ordinarily, a defendant is not entitled to a list of the names and addresses of the government's witnesses" and where the informant does not testify, disclosure is made on a "case-by-case basis" under *Roviaro*. *United States v. Perkins*, 994 F.2d 1184, 1190−91 (6th Cir. 1993). Where, as here, Wilson knew the informant's identity and could have taken steps to produce the witness but did not, the district court did not abuse its discretion in denying the motion to produce Nunn.

C.

Defendants also object to the government's use of transcripts at trial. As a preliminary matter, the parties dispute the standard of review. Typically, we review a district court's rulings

involving a jury's use of transcripts for abuse of discretion. *United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004). Under that standard, "[a] defendant challenging the use of a transcript at trial must show prejudice." *Id.* When a defendant fails to object before the district court, we review for plain error. *United States v. Stover*, 474 F.3d 904, 913 (6th Cir. 2007).

In this case, defendants objected to the use of three transcripts. Defendants had a standing objection to Nunn's statements based on hearsay; the objection did not extend to the government's use of transcripts as argued on appeal. We therefore review the use of three transcripts for abuse of discretion and the remaining transcripts for plain error.

Our court has identified at least three ways that a district court may permit the use of disputed transcripts at trial: by stipulation, a court's pretrial ruling that the transcripts are accurate, or allowing two transcripts to be presented to the jury "one of which contains the government's version and the other the defense's version." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983).

At trial, the government provided written transcripts for the jury to read as it watched and listened to the recordings. The court instructed the jury several times that the transcripts were not evidence and were intended to assist the jury in following the recordings. The court permitted defendants to introduce competing transcripts and to highlight these differences during cross-examination. Although presenting competing transcripts to the jury is the "least preferred" method, *Robinson*, 707 F.2d at 876, the government argues that defendants "essentially eliminated the possibility for the district court to use the first two methods described above" by waiting until the middle of trial to raise objections to the transcripts. Moreover, the government argues that the disputed portions had little significance in light of all the evidence: defendants

did not introduce many competing transcripts, and Davis disputed only one inaccuracy. This prompted the government to play the tape again for the jurors to decide for themselves.

The district court did not abuse its discretion in allowing the jury to view the transcripts. The court permitted defendants to raise alternative interpretations of the recordings, and the district court instructed the jury on several occasions that the recordings—not transcripts—were evidence. Furthermore, defendants have not established that they were prejudiced. *See Jacob*, 377 F.3d at 582 (any error was harmless where district court repeatedly instructed that the transcript was not evidence and a substantial portion of the tape was not inaudible); *see also United States v. King*, 467 F. App'x 499, 501 (6th Cir. 2012) (no prejudice where the district court instructed the jury that the transcripts were not evidence and the jury did not have access to transcripts during deliberations).[9]

### D.

Finally, Wilson asserts that the district court erred in sentencing him to life imprisonment. He raises two grounds: first, he lacks three qualifying convictions under the Armed Career Criminal Act, and, second, his life sentence for conspiring to possess with intent to distribute controlled substances (Count 4) is unconstitutionally disproportionate under the Eighth Amendment.

### 1.

Wilson argues that the district court plainly erred in sentencing him as an armed career criminal because he lacks three qualifying convictions. *See* 18 U.S.C. § 924(e)(1). But even assuming the error was plain (which the government forcefully contests), it did not affect Wilson's substantial rights because Wilson was subject to a mandatory life sentence for Count 4.

---

[9]Wilson's final argument as to his conviction is that cumulative error warrants reversal. As any error was harmless, no cumulative error undermined the fairness of his trial.

*See* 21 U.S.C. § 841(b)(1)(A); *Puckett v. United States*, 556 U.S. 129, 135 (2009) (to prevail under plain-error review, defendant has the burden of establishing that the error "affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings.") (internal quotation marks omitted); *United States v. Burns*, 298 F.3d 523, 544−45 (6th Cir. 2002) ("The sentences that [the defendants] received on Counts 3 and 4 run concurrently with their sentences on Count 2, and do not add any length to the overall terms of imprisonment. Any *Apprendi* error that the district court might have committed . . . is therefore harmless, because it would not affect the defendants' substantial rights."); *United States v. Ellis*, 326 F.3d 593, 600 (4th Cir. 2003) (error related to a thirty-year sentence on one count did not affect defendant's substantial rights because he received a concurrent life sentence on another count).[10]

2.

Wilson's final claim of error is that his mandatory life sentence for Count 4 is unconstitutionally disproportionate.[11] We review de novo.[12]

In reviewing Eighth Amendment challenges, our court adheres to the "narrow proportionality principle" described in Justice Kennedy's concurring opinion in *Harmelin v.*

---

[10]Wilson acknowledges as much but asks us to address the potential error in case he obtains post-conviction relief or the law changes with respect to statutory minimums. The record before us establishes that Wilson is subject to a mandatory life sentence. Absent a mandatory life sentence, our substantial rights analysis might be different.

[11]Wilson does not dispute that he has "two or more prior convictions for a felony drug offense" for purposes of 21 U.S.C. § 841(b)(1)(A). The qualifying felonies include: (1) a 1994 Ohio conviction for aggravated drug trafficking, (2) a 2001 Michigan conviction for delivery/manufacture of a controlled substance, and (3) a 2007 Michigan conviction for possession of a controlled substance less than 25 grams.

[12]Although the government argues that we review for plain error, Wilson preserved the issue by challenging the sentencing enhancement on several grounds, including Eighth Amendment proportionality.

*Michigan*, 501 U.S. 957, 996−97 (1991). *United States v. Hill*, 30 F.3d 48, 50 (6th Cir. 1994); *United States v. Stone*, 218 F. App'x 425, 443 (6th Cir. 2007). "Under this approach, the Eighth Amendment does not demand strict proportionality between crime and sentence but forbids 'only extreme sentences that are grossly disproportionate.'" *Stone*, 218 F. App'x at 443 (quoting *Harmelin*, 501 U.S. at 1001).

We have previously upheld mandatory life sentences for possessing, or conspiring to possess, with intent to distribute controlled substances. In *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008), we affirmed a mandatory life sentence in light of *Harmelin*. We observed that in *Harmelin*, the defendant was convicted for possessing more than 650 grams of cocaine and he was sentenced to a mandatory life sentence without the possibility of parole. *Id.* Although it was his first felony conviction, his life sentence was not disproportionate because, under a narrow proportionality principle, "only extreme sentences that are grossly disproportionate to the crime" are unconstitutional. *Id.* (internal quotation marks omitted). Accordingly, the defendant's sentence in *Odeneal* was not unconstitutionally disproportionate because he was convicted of conspiracy to distribute and to possess with intent to distribute and was therefore accountable for all drugs seized (including 6 kilograms of marijuana, 1,088.7 grams of cocaine, 378.61 grams of cocaine base, and 48.5 grams of heroin) and he was a co-organizer or co-leader. *Id.* Similarly, in *United States v. Hill*, we upheld the defendant's life sentence under the narrow proportionality principle where he was a third-time offender accountable for conspiracy to distribute 177.8 grams of cocaine base. 30 F.3d 48, 50 (6th Cir. 1994). Although "it may seem rather extreme to impose a life sentence on a defendant who is convicted with intent to distribute, this Court is bound by the precedent set forth in [Hill]." *United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998).

In this case, Wilson's conduct (conspiring to possess with intent to distribute 280 grams or more of crack cocaine and between one-half and five kilograms of powder cocaine) after three prior drug felonies is worse than Harmelin's conduct and on par with other defendants whose life sentences we have upheld. Wilson's mandatory life sentence is not unconstitutionally disproportionate.

## III.

For these reasons, we affirm the judgment of the district court as to both defendants.