**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0597n.06

**No. 09-3191**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Sep 08, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| BUTCH RAY DIXON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BOGGS, SILER, and MOORE, Circuit Judges.

**SILER**, Circuit Judge. Butch R. Dixon was convicted of attempting to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and sentenced to 120 months' imprisonment. He appeals his conviction, claiming insufficiency of the evidence and that the district court erred by admitting certain evidence and failing to instruct the jury on entrapment. For the following reasons, we **AFFIRM**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent Jeremy Godsave, acting undercover and accompanied by an ATF confidential informant ("CI"), met with Dixon's cousin Kevin Tincher to propose a robbery of a sham drug stash house. Tincher arranged a second meeting between himself, the CI, and Dixon. Two days later, all four men met at Tincher's

residence to discuss the robbery. Dixon indicated several times that he wished to conduct surveillance on the stash house before committing the robbery.

The robbery was to occur on February 1, 2008. During a telephone conversation that morning, Dixon expressed hesitancy to go forward with the robbery, but told Godsave that "he wouldn't be up if he wasn't serious about doing it." He informed Godsave that he wanted to conduct more surveillance and watch a "pick up" and "drop off" to "see how the operation happened." Following that phone conversation, Godsave and Dixon did not speak again until February 22, 2008, although the CI contacted Dixon on February 14, 2008, to inquire as to the whereabouts of Tincher.

On February 22, 2008, the agents devised a plan to set up a reverse controlled buy with Dixon. The CI called Dixon and told him that they completed the robbery with the help of some other people and that they got away with "nine bricks" and "twenty thousand bucks." The CI asked if Dixon could do anything with the cocaine, and Dixon said he could. The CI also asked Dixon whether "20 a piece was good" (presumably asking if $20,000 per brick would be an appropriate price). Dixon responded "yeah, that's good." The CI told Dixon he would call back later with more information. Between the first and second phone calls, Dixon tried to call the CI three times. The CI eventually called Dixon back and said he wanted to sell "six bricks" and he asked Dixon if Dixon could front him some money for the cocaine. Dixon told the CI, "it won't take long dude, trust me."

Soon thereafter, Godsave and the CI drove to Dixon's apartment. The CI then made the final call to Dixon, instructing Dixon that he and Godsave were waiting outside and that Dixon needed to bring a bag in which to carry the cocaine. Seconds later, Dixon came outside with an empty duffle bag and entered the car. Upon receiving the sham cocaine, Dixon stated, "you . . . did it, I can't

believe it." Dixon was immediately arrested by ATF agents. The agents found $2,400 in Dixon's pocket, as well as sixty tablets of Oxycodone and $5,000 in his apartment.

Dixon was indicted on two counts: attempting to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count One); and possession with intent to distribute Oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Two). The jury found Dixon guilty of Count One and not guilty of Count Two. He was sentenced to 120 months' imprisonment, the mandatory minimum sentence.

## II. DISCUSSION

### A. Sufficiency of the Evidence

When the sufficiency of the evidence is challenged on appeal, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "To convict a person of 'attempt' to commit a drug offense, the government must establish two essential elements: (1) the intent to engage in the proscribed criminal activity, and (2) the commission of an overt act which constitutes a substantial step towards commission of the proscribed criminal activity." *United States v. Pennyman*, 889 F.2d 104, 106 (6th Cir. 1989). A substantial step is "conduct strongly corroborative of the firmness of the defendant's criminal intent." *United States. v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999) (internal quotation marks and citation omitted). However, "the substantial step [must] consist of objective acts that mark the defendant's conduct as criminal in nature." *Id.*

A rational juror could have concluded that Dixon took a substantial step toward the commission of the offense. For example, there is evidence of negotiation between Dixon and the CI: Dixon indicated he could do something with the cocaine; they talked about price; and they discussed the amount of cocaine the CI would sell Dixon. Although the two men never agreed on the amount that Dixon would give the CI up front, the CI said he was broke and that it would be okay for Dixon to just bring him a little. Dixon appeared to agree to that when he brought $2,400 to the location of the exchange. Moreover, Dixon appeared willing and ready to take possession of the cocaine, evidenced by the fact that he carried an empty bag in which to place the cocaine. Under *Bilderbeck*, a rational trier of fact could easily have found that Dixon's acts constituted a substantial step towards possession of the cocaine. *See* 163 F.3d at 976-77 (finding sufficient evidence of a substantial step even though the defendant never agreed on a price or quantity of cocaine or attempted to take possession of the cocaine).

Dixon also contends that there was insufficient evidence to demonstrate his subjective intent to possess the cocaine. Specifically, he points to the fact that he only had $2,400 in his possession—far short of the agreed-upon $120,000 for six kilograms. However, because the CI simply asked Dixon to bring him "a little" bit of money, the fact that Dixon did not have the entire $120,000 does not indicate he did not intend to take possession of the cocaine. Dixon's own words and actions constituted evidence of his subjective intent. Although Dixon is correct that his statements expressed incredulity at the fact that the CI robbed the stash house, a jury could reasonably infer his statements were expressions of surprise or astonishment, rather than literal disbelief. Thus, his statements do not negate his other expressions of intent. Construing the

evidence in the light most favorable to the government, a reasonable juror could conclude that Dixon's statements and actions demonstrated his intent to possess and distribute cocaine.

## B. Entrapment Instruction

"We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)). A defendant is entitled to an entrapment instruction "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* (quoting *Mathews v. United States*, 485 U.S. 58, 62 (1988)). The affirmative defense has two elements: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews*, 485 U.S. at 63. "To be entitled to an entrapment instruction, the defendant must come forward with evidence to support both elements of the defense." *Khalil*, 279 F.3d at 364.

Even if Dixon presented sufficient evidence demonstrating his lack of predisposition to commit the crime, he did not present sufficient evidence of government inducement. "In their zeal to enforce the law, . . . Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). However, law enforcement agencies are entitled to use sting operations by which they give defendants the opportunity to commit crime. *See Sherman v. United States*, 356 U.S. 369, 372 (1958). To show inducement, a defendant must present evidence of "repeated and persistent solicitation" by the government. *Sorrells v. United States*, 287 U.S. 435, 441 (1932).

"An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994). Dixon has not presented evidence of "opportunity *plus*." Even considering the government's behavior regarding the fictional stash house, the evidence still does not show government inducement. Accordingly, the district court did not commit reversible error by denying Dixon's request for a jury instruction on entrapment.

## C. Evidence Regarding Initial Meetings

Dixon also argues that the district court erred by permitting the jury to hear recorded conversations from the two January meetings, as well as testimony regarding those meetings, contrary to Federal Rule of Evidence 404(b). We generally review the district court's evidentiary rulings for abuse of discretion. *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009). We have consistently recognized that background or *res gestae* evidence does not implicate Rule 404(b). *See, e.g.*, *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). *Res gestae* evidence "consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *Id.* The recordings from the January meetings are "inextricably intertwined" with the offense of attempting to possess with intent to distribute cocaine. Accordingly, the district court did not err in concluding that the evidence was admissible for a proper purpose.

**AFFIRMED.**