NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0156n.06

No. 16-1147

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 10, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| JOHN GERALT, D.O., | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  MERRITT, KETHLEDGE, WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  John Geralt, D.O., was convicted by a jury of conspiring to distribute and possess with intent to distribute controlled substances, specifically oxycodone (OxyContin) and oxymorphone (Opana) (Schedule II), hydrocodone (Vicodin, Lortab) (Schedule III), alprazolam (Xanax) (Schedule IV), and promethazine cough syrup with codeine (Schedule V), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.  He was sentenced to 180 months' imprisonment and three years' supervised release.  Geralt appeals, asserting that the evidence is insufficient to support his conviction and that the district court erred by not giving an entrapment instruction and in calculating the quantity of drugs attributable to him.  We disagree, and **AFFIRM**.

**I.**

In approximately 2009, a multi-agency task force organized by the Drug Enforcement Agency ("DEA") began investigating a healthcare company called Compassionate Doctors

("Compassionate")[1] controlled by Sardar Ashrafkhan. Compassionate, they eventually learned, was the hub of a criminal operation overseen by Ashrafkhan and involving dozens of co-conspirators.

A.

Compassionate used a network of so-called "street marketers" to recruit individuals to serve as patients, and paid those individuals in cash or drugs.[2] Compassionate's doctors conducted cursory examinations of some of these patients at Compassionate's barebones office, which did not even have an examination table or facilities for treating patients. The doctors also sometimes attended "house parties" organized by the marketers, at which groups of patients would appear. In other instances, the doctors never met with their patients at all, but instead relied on information provided by unlicensed medical-school graduates or others. For most, if not all of these patients, the "treatment" was the same: the Compassionate doctor wrote a prescription for opioid pain relievers or cough syrup with codeine. Some of Compassionate's doctors also signed blank prescriptions that were later completed by a marketer or another co-conspirator. The prescriptions were then filled at several cooperating pharmacies, after which the marketers took possession of the narcotics and resold them to street-level drug dealers. Over the course of several years, this scheme involved hundreds of thousands of dosage units of narcotic pain medication with a street value in the tens of millions of dollars. Compassionate

---

[1] The name was later changed to Compassionate Care. We refer to the company simply as "Compassionate."

[2] More fully, the marketers' role was to canvass senior centers, soup kitchens, and other locations, identify willing participants with insurance—preferably Medicare, make sure they understood they would not receive any actual medical care, and then arrange regular visits with Compassionate's doctors. They also filled the prescriptions and sold the pills to street-level drug dealers.

and other involved healthcare companies also billed Medicare, Medicaid, and various private insurers over $20 million for medical services they did not provide.

Geralt was a latecomer to Ashrafkhan's operation. Geralt had been practicing medicine for more than 60 years when, in 2010, a lack of business forced him to close the clinic he owned and operated. Geralt had also lost well over $1 million through a series of bad investments; he owed approximately $400,000 on a home equity loan; and he and his wife apparently had little income aside from social security benefits. It was in that context that Geralt connected with Compassionate through Craig's List.

Geralt began working for Compassionate in June 2010 and continued until the company was raided by law enforcement and its files were seized in July 2011. Geralt does not contest certain key facts: he met with patients at Compassionate's offices; prescribed pain medications to those patients; and did so while, in at least some cases, relying, inappropriately and contrary to sound medical practice, on false information provided by Verdell Lovett, a street marketer, and Javar Myatt-Jones, an unlicensed medical-school graduate. Geralt contends, however, that he was ignorant of the drug conspiracy, that he did not know Lovett, Myatt-Jones, and the patients he was seeing were lying to him, and that all but a few of the prescriptions he wrote were legitimate.

Shortly after the authorities shut down Compassionate, Geralt began working for Midwest Medical Point of Care Clinic ("Midwest"), another healthcare company controlled by Ashrafkhan. Geralt remained employed at Midwest until at least January 2013. Records maintained by the State of Michigan show that, during his time with Compassionate and Midwest, Geralt wrote prescriptions for 3,484,696 dosage units of controlled substances,

including 92,320 units of oxycodone, 685,292 units of hydrocodone, 306,155 units of alprazolam, and 760,074 units of promethazine cough syrup with codeine.

B.

The instant indictment was filed on March 20, 2013, and charged Geralt and 43 others with conspiracy to distribute and possess with intent to distribute controlled substances, including oxycodone, oxymorphone, hydrocodone, alprazolam, and promethazine cough syrup with codeine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Forty-one co-defendants pleaded guilty; only Geralt, Ashrafkhan, and Adelfo Pamatmat (another of Compassionate's doctors) went to trial.[3]

The trial was held over seven weeks in the summer of 2015. Lovett testified he had a long-running arrangement with Ashrafkhan and Compassionate in which he recruited individuals to pose as patients, Compassionate's doctors wrote prescriptions for pain medications, and Lovett filled the prescriptions at cooperating pharmacies before reselling the pills to street-level drug dealers. Lovett testified that he brought patients to Compassionate on December 15, 2010 then returned with lists of patient names on December 22 and 29, 2010, and January 5, 2011. Lovett then received a batch of prescriptions signed by Geralt, including prescriptions for oxycodone and promethazine cough syrup with codeine. According to Lovett, none of the individuals he bought to Compassionate were there for legitimate medical reasons.

Lovett further testified that he brought three "patients"—Thelma Riddles, Ophalia McRae, and Clifford Lawrence—to see Geralt at Compassionate's offices on January 12, 2011,

---

[3] Geralt, Ashrafkhan, Pamatmat, and 29 others were also charged with conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347 and 1349 in connection with the fraudulent billing scheme. The jury convicted Ashrafkhan and Pamatmat of healthcare fraud, but did not reach a verdict as to Geralt. The government abandoned that count, so we do not discuss the healthcare-fraud conspiracy or the related evidence.

and that he was present the entire time Geralt spent with each of them. By that point, Lovett was working as an informant for the government, and law enforcement made a recording of Lovett's interactions with Geralt, excerpts of which were played for the jury at trial.[4] Geralt said he had no problem writing prescriptions for Vicodin or cough syrup with codeine, but because of a government crackdown on the most powerful drugs, patients needed to report having cancer in order for him to write prescriptions for OxyContin or Opana.

Riddles was the first patient to be seen by Geralt. She complained only of a runny nose, and Geralt did not examine her. Nevertheless, Geralt wrote her prescriptions for Vicodin and promethazine cough syrup with codeine. McRae was seen next. Lovett told Geralt: "Ophalia, she does have cancer;" and "All of a sudden she's a cancer patient, Doc." (R. 1451, PID 12312, 12315.) McRae also told Geralt she was suffering from back pain as the result of an accident. As with Riddles, Geralt did not examine McRae. Nevertheless, he prescribed her oxycodone and wrote on the prescription that she suffered from uterine cancer. Finally, Geralt saw Lawrence. Lawrence reported that he had prostate cancer. Geralt did not examine him, but wrote prescriptions for Opana and promethazine cough syrup with codeine.

A few weeks later, Lovett brought more "patients" to Geralt at the Compassionate office. The government made a recording of this meeting, excerpts of which were played for the jury at trial and explained by Lovett. The first patient was Frankie Jackson. Geralt did not examine him. Lovett promised to provide paperwork that would show Jackson had cancer; on that basis,

---

[4] The complete recording and a transcript of it were admitted into evidence. Neither the recording or the transcript appear to have been made part of the district court's electronic record, however. Nor have they been made part of the record in this court. However, Lovett testified in detail about what happened that day, and provided context for each excerpt played to the jury. Neither party cites directly to the recordings in their briefs to this court; instead both rely on Lovett's testimony only. We therefore do likewise. The same caveat applies to all the government's undercover recordings and the testimony describing them.

Geralt wrote a prescription for 30-milligram OxyContin pills. Geralt also prescribed promethazine cough syrup with codeine, although Jackson had not complained of a cough. The second patient was Wilson Riddles, whom Geralt wrote a prescription for 80-milligram OxyContin pills. However, by this point in time, Lovett knew that the 80-milligram OxyContin pill had been reformulated so that it could not be crushed and snorted or injected, which greatly diminished its street value. Lovett therefore asked Geralt to change the prescription to 30-milligram pills, which had greater street value. Geralt obliged. As with Jackson, Geralt wrote Riddles a prescription for promethazine with codeine although Riddles never complained of a cough.

The jury also heard from Javar Myatt-Jones, an unlicensed medical-school graduate and another member of Ashrafkhan's network. Among other things, Myatt-Jones was responsible for creating fake patient charts for Compassionate's doctors to sign. After authorities searched Myatt-Jones's home in November 2010, he agreed to cooperate with their ongoing investigation. As part of that cooperation, Myatt-Jones produced fake patient charts and took them to Compassionate on February 1, 2011, to be signed in accordance with his usual procedure. On February 8, Myatt-Jones again visited Compassionate and told Geralt that he was not a licensed doctor. The government made a video recording of this conversation and played excerpts of it for the jury at trial.

Myatt-Jones returned to Compassionate on February 9, and again the government made a video recording of his interactions with Geralt, excerpts of which were played for the jury. During their meeting, Geralt signed off on the charts submitted by Myatt-Jones, even though he had not examined any of the supposed patients. Myatt-Jones then asked Geralt to prescribe Vicodin for six patients, and Geralt prescribed each patient either Vicodin or Lortab, a similar

Schedule III drug,[5] in the quantities requested by Myatt-Jones. According to Myatt-Jones, Geralt never refused to prescribe a narcotic as requested.

Myatt-Jones met with Geralt at Compassionate again on February 17, 2011. Myatt-Jones brought Geralt four more fraudulent charts to sign, which he did, again without examining the "patients" or questioning the propriety of Myatt-Jones's actions. Excerpts of a recording of the meeting were played for the jury. Geralt asked Myatt-Jones: "You just want the Vicodin and Lortabs?," (R. 1125, PID 7129), and then wrote four new prescriptions for Vicodin or Lortab.

The government also presented testimony from expert witness Eugene Mitchell, a medical doctor. Dr. Mitchell had reviewed the recordings and transcripts of Lovett's two meetings with Geralt, and testified that "[i]n [his] 30 years of medical practice," he had "never heard of anybody having patients brought to an office practice by a recruiter or" someone such as Lovett. (R. 1454, PID 12961–64.) Asked about Geralt's practice of interacting with patients though Lovett, Dr. Mitchell opined: "It doesn't constitute any semblance of normal or appropriate medical practice." (*Id.* at 12964.) Dr. Mitchell was harshly critical of Geralt's failure to take detailed medical histories from his patients and his failure to review medical records, such as lab test results and x-rays. Dr. Mitchell also concluded there was "no basis" for Geralt's willingness to prescribe pain medication based on Lovett's promise to provide medical records in the future. (*Id.* at 12967.) He also found it inappropriate that Geralt had prescribed promethazine cough syrup with codeine without listening to the patients' lungs, and opined that prescribing multiple opioids—such as oxycodone or hydrocodone combined with cough syrup containing codeine—to the same patient simultaneously was "redundant and clinically

---

[5] Both brands of pill combine hydrocodone and acetaminophen. *See* U.S. Nat'l Library of Medicine, *Hydrocodone/Acetaminophen (By mouth)*, PubMed Health, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/ (last visited March 8, 2017).

inappropriate." (*Id.* at 12971–72.) Further, Dr. Mitchell testified that Geralt had not appropriately examined any of the patients brought to him by Lovett, and had not followed proper procedures for prescribing controlled substances because he had not checked his patients' prescription history in the computer system maintained by the state for that purpose, nor had he required his patients to sign patient/physician medication contracts.

Dr. Mitchell was also asked specifically about Geralt's willingness to change a prescription from 80-milligram OxyContin pills to 30-milligram pills at Lovett's request. Dr. Mitchell had never heard of such a thing, and opined that allowing a third party such as Lovett to "render[] an opinion about what controlled substance . . . is appropriate for the patient . . . has no legitimate foundation in clinical practice." (R. 1454, PID 12979–80.)

Finally, Dr. Mitchell was asked about the patient charts created by Myatt-Jones and signed by Geralt. Dr. Mitchell testified that it was entirely outside of legitimate medical practice for Geralt to have signed the charts of patients he had never examined. (R. 1454, PID 12988.) Dr. Mitchell also opined that the charts were internally contradictory, lacked necessary details, and did not support prescribing controlled substances. For example, Dr. Mitchell noted that patient Glenn Sutton's chart showed that he was experiencing tenderness of the abdomen while also stating that his physical examination was normal. Further, despite the lack of any evidence of a serious medical condition, Geralt prescribed Sutton the "holy trinity" of Vicodin (hydrocone), Soma (carisoprodol, a skeletal muscle relaxant),[6] and Xanax (alprazolam, a benzodiazepine used to treat anxiety),[7] a combination of drugs known to have both a high

---

[6] *See* U.S. Nat'l Library of Medicine, *Carisoprodol (By mouth)*, PubMed Health, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009466/ (last visited March 8, 2017).

[7] *See* U.S. Nat'l Library of Medicine, *Alprazolam (By mouth)*, PubMed Health, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/ (last visited March 8, 2017).

potential for abuse and a high likelihood of diversion to the black market. (*Id.* at 12969–70, 12993–94.) Finally, Dr. Mitchell characterized Geralt's practice as "basically rubber stamping the chart of whoever" was presented to him, and testified there was "no legitimate purpose whatsoever" that would justify Geralt's willingness to rely on an unlicensed medical-school graduate such as Myatt-Jones. (*Id.* at 12992, 12996.)

DEA agent Harry Swain testified that authorities found a blank prescription pre-signed by Geralt when they searched Compassionate's offices in July 2011, which was introduced into evidence. Swain also recounted interviewing Geralt in Geralt's home in December 2012. According to Swain, Geralt answered some questions truthfully. For example, Geralt acknowledged that he began working for Compassionate in the summer of 2010 and later moved to Midwest. He also acknowledged that "on a couple occasions," he had visited a house on Marlborough Street in Detroit where "multiple patients gathered," (R. 1444, PID 11682–83), and that he might have seen Lovett there. Geralt also acknowledged working with Paul Kelly, another Compassionate doctor.

However, Swain testified that based on what Swain knew from the undercover recordings and the search of Compassionate's office, Geralt was not truthful in response to other questions. In particular, Geralt denied inappropriately prescribing cough syrup with codeine, and stated that every patient who received such a prescription had a cough. He also denied knowing or ever meeting Myatt-Jones, despite being shown a picture of Myatt-Jones. Further, Geralt told Swain that he did not pre-sign blank prescriptions. Also, according to Swain, Geralt "said he never changed a prescription based on a marketer['s] request." (R. 1444, PID 11689.) Finally, in a written statement, Geralt claimed that he "personally treated and filled out charts for" his patients at Compassionate. (*Id.* at 11692.)

The government's last witness was Scott O'Connell, an auditor in the healthcare fraud unit of the United States Attorney's Office. O'Connell described how he used a database maintained by the state to gather information on the number and type of prescriptions written by the doctors at Compassionate and Midwest between May 1, 2010, and January 10, 2013. O'Connell found that during that period, Geralt accounted for 760,074 dosage units of promethazine cough syrup with codeine, 685,292 units of hydrocodone, 306,155 units of alprazolam, 92,320 units of oxycodone, and 36,736 units of carisoprodol. On cross-examination, however, O'Connell acknowledged that his analysis did not account for the possibility that someone might have forged Geralt's signature on prescriptions. O'Connell also acknowledged that the state database relies on data reported by pharmacies, and that he had not verified the underlying data.

Geralt presented testimony from Jeffrey Forman, M.D. Dr. Forman testified that Geralt was diagnosed with "intermediate to high risk prostate cancer" in April, 2011. (R. 1456, PID 13489.) Dr. Forman oversaw Geralt's treatment, which included hormonal medication and radiation. This treatment caused side effects, including hot flashes, sweating, difficulties with bowel movements, and a severe body-wide rash and itching. The treatment was successful, however, and Geralt remained cancer-free as of May 2015. On cross-examination, Dr. Forman acknowledged that there was no evidence Geralt ever suffered from neurological problems, or that any of Geralt's health problems would have prevented him from providing competent medical care to his own patients.

The jury also heard from Kevin Brown, Michael Taylor, and Sandra Thomas, who testified that they received satisfactory treatment from Geralt at Compassionate or Midwest. Taylor specifically testified that he suffered from spinal problems and permanent arthritis in his

right ankle, acid reflux problems, and heart disease, and that Geralt prescribed oxycodone for his pain and Zantac and baby aspirin for his other health problems. Thomas testified that Geralt prescribed pain medication for her. Further, Keisha Fair, a medical assistant who worked at Compassionate, testified that Geralt treated her for shoulder pain by manipulating her shoulder and giving her a cortisone shot.

The jury found Geralt guilty of the drug conspiracy. At sentencing, the district court found him responsible for drugs with a marijuana equivalency of 38,853 kilograms. This resulted in a base offense level of 36, which, combined with a two-level enhancement for use of a special skill, Geralt's lack of any criminal history, and the statutory maximum sentence, *see* 21 U.S.C. §§ 841(b)(1)(C), 846, produced a guidelines range of 235 to 240 months. The district court, emphasizing Geralt's advanced age (87 at the time he was sentenced) and serious health problems, imposed a below-guidelines sentence of 180 months' imprisonment.

Geralt now appeals, asserting: (1) the evidence is insufficient to support his conviction; (2) the district court's refusal to give an entrapment instruction was reversible error; and (3) the district court's determination of the amount of drugs attributable to him is not supported by the evidence.

## II.

Geralt asserts that the evidence is insufficient to support his conviction.

> [T]his Court reviews de novo a district court's denial of a Rule 29 motion for judgment of acquittal based on the insufficiency of the evidence. The Court must construe the evidence in the light most favorable to the government, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (citations omitted) (quotation marks removed).

"[I]n order to establish a drug conspiracy in violation of 21 U.S.C. § 846, 'the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Powell*, ___ F.3d ___, No. 14-2506, 2017 WL 474343, at \*14 (6th Cir. Feb. 6, 2017) (quoting *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999)). "Once the existence of the conspiracy is proven, only slight evidence is needed to connect a defendant to the conspiracy." *Id.* (citing *Gibbs*, 182 F.3d at 422). Finally, "knowledge and intent to join the conspiracy may be inferred from [a defendant's] conduct and established by circumstantial evidence." *Id.* (citing *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

Geralt acknowledges there was a drug conspiracy at work here. And he does not challenge the jury's conclusion that he participated in the conspiracy—nor could he plausibly do so, given the testimony of Lovett and Myatt-Jones and the recordings of his interactions with them. Thus, the first and third elements of the offense are not at issue. Geralt argues, as he did below, that there is insufficient evidence to support the conclusion that he knowingly joined the drug conspiracy. We disagree.

A.

Geralt correctly points out there is no evidence that he expressly agreed to further the drug conspiracy, and in the recordings played for the jury, neither Lovett or Myatt-Jones told Geralt his goal was to procure drugs for illegal sale. However, "knowledge and intent to join the conspiracy may be inferred from [a defendant's] conduct and established by circumstantial evidence." *Powell*, 2017 WL 474343 at \*14 (citing *Martinez*, 430 F.3d at 330). Here, the recordings, supported by Lovett's and Myatt-Jones's testimony, are strong circumstantial evidence that Geralt knew the drugs he was prescribing were destined for the street. Geralt

argues that, at most, he relied inappropriately, but innocently, on the representations of others. However, we are required to give the government the benefit of all reasonable inferences to be drawn from the evidence, and the evidence is more than sufficient to sustain Geralt's conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In particular, when Geralt told Lovett that patients needed to report having cancer in order for him to write prescriptions for OxyContin or Opana, Lovett responded by saying of one patient: "All of a sudden she's a cancer patient, Doc." (R. 1451, PID 12315.) Without any meaningful medical examination, Geralt then wrote a prescription for oxycodone, on which he noted that the patient had uterine cancer. A jury could reasonably infer from this conduct that Geralt was aware that, as the district court put it, "he was right in the middle of a pill mill operation." (R. 1463, PID 14367.) That inference is supported by Dr. Mitchell's testimony that Geralt's conduct when meeting with Lovett and Myatt-Jones was completely outside the bounds of legitimate medical practice. *See United States v. Volkman*, 797 F.3d 377, 386 (6th Cir. 2015) ("[K]nowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances.") (quoting *United States v. Kanner*, 603 F.3d 530, 535 (8th Cir. 2010)).

The inference that Geralt was not ignorant of the drug conspiracy is also supported by Agent Swain's testimony that Geralt denied knowing or having met Myatt-Jones, insisted that every patient to whom he prescribed cough syrup with codeine had a cough, and denied ever changing a prescription at a marketer's request. Those claims were contradicted by Lovett's and Myatt-Jones's testimony and the recordings of their interactions with Geralt. Further, Geralt's assertion to Agent Swain that he never signed any blank prescriptions was contradicted by the discovery of a blank prescription with his signature on it at Compassionate's office.

A reasonable jury could infer from these contradictions that Geralt was trying to cover up his own voluntary participation in the drug conspiracy.

Lastly, Geralt's decision to work for Midwest after Compassionate was shuttered by authorities could reasonably be taken to indicate that Geralt had knowledge of the ongoing conspiracy. *See United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014) (defendant's drug conspiracy conviction upheld, in part, because the defendant "continued to operate Ohio Medical's two branches *after* previous clinics had been shut down," showing knowledge of the conspiracy) (emphasis in original). Further, evidence drawn from the state's prescription database showed that Geralt continued to prescribe pain medications during his time at Midwest, and that in the second half of 2011, Geralt stopped prescribing 80-milligram OxyContin pills entirely, but continued to prescribe Opana. Lovett explained that the 80-milligram OxyContin pills had lost their street value, and that Geralt had previously agreed to replace a prescription for 80-milligram OxyContin pills with one for more valuable 30-milligram pills. Thus, the jury could reasonably infer that Geralt's move away from 80-milligram OxyContin prescriptions reflected both knowledge that the drugs he prescribed would be sold on the street and a willingness to advance that goal by prescribing more valuable pills.

B.

Geralt argues he could not have known about the drug conspiracy because "many of the co-conspirators testified that they did not know who Dr. Geralt was, or that they had never met him." (Appellant's Br. at 21–22.) This argument is legally and factually flawed.

> [I]n a drug distribution "chain" conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy.

*Martinez*, 430 F.3d at 332–33. Geralts admits Compassionate was at the center of "illegal controlled substance distribution activities" and that he was an employee of Compassionate. (Appellant's Br. at 6.) The jury watched and listened to recordings of Geralt providing prescriptions at Lovett's and Myatt-Jones's request without examining the "patients" for whom those prescriptions were written. That was more than enough for a reasonable jury to infer that Geralt was a willing participant in the conspiracy.

Further, *United States v. DeLutis*, 722 F.2d 902 (1st Cir. 1983), on which Geralt relies, is distinguishable. In *DeLutis*, police were searching the home of a known cocaine dealer when the defendant called the house and attempted to arrange a purchase. *Id.* at 904–05. An officer invited the defendant to come to the house, where he was arrested. *Id.* at 905. The court reversed the defendant's conspiracy conviction, explaining that there was "no independent evidence that DeLutis had any knowledge of the conspiracy [between the dealer and his associates] to distribute cocaine or to possess with intent to distribute cocaine. Furthermore, there was no single act of DeLutis from which such knowledge might be inferred." *Id.* at 906. Here, however, Geralt worked at Compassionate and Midwest for several years, and the recordings and the testimony from Lovett and Myatt-Jones provide ample evidence that Geralt knew of the scheme to divert prescription narcotics to the black market. In particular, a jury could reasonably take Geralt's statement that because of a government crackdown he would only prescribe the most powerful medicines to patients who reported having cancer and his willingness to alter a prescription at Lovett's request to mean that Geralt was knowingly and willingly facilitating the smooth operation of the conspiracy.

C.

Geralt argues there was insufficient evidence to support the government's contention that he wrote prescriptions at house parties. Geralt is correct that the evidence on this point is contradictory. For example, Lovett testified that Geralt never came to his house, and Myatt-Jones testified he never saw Geralt at a house party. On the other hand, Geralt told Agent Swain that, at the beginning of his time with Compassionate, he "was going out to homes" where "multiple patients gathered." (R. 1444, PID 11682.) Viewed in the light most favorable to the government, this evidence is enough to support the conclusion that Geralt did attend house parties. *See Jackson*, 443 U.S. at 319. Further, even if that were not the case, it would not matter. Regardless whether Geralt ever participated in a house party, the evidence relating to his interactions with Lovett and Myatt-Jones is more than sufficient to support the inference that Geralt was a knowing and active member of the conspiracy.

D.

Geralt also argues that the evidence is insufficient to sustain his conviction because he merely "furnish[ed] supplies to the conspiracy." (Appellant's Br. at 25 (citing *United States v. Falcone*, 311 U.S. 205 (1940).) *Falcone* dealt with merchants who "sold sugar, yeast or cans" to members of a bootleg liquor conspiracy. 311 U.S. at 206–07. "*Falcone* and the subsequent decision in *Direct Sales Co. v. United States*, 319 U.S. 703 [] (1943), hold that one does not become a party to a conspiracy merely by supplying goods that he knows the buyer will use illegally, unless he also knows of the conspiracy." *United States v. Ross*, 190 F.3d 446, 450 (6th Cir. 1999). For the reasons discussed above, there is sufficient evidence for the jury to have reasonably concluded that Geralt was aware of the drug conspiracy.

Contrary to Geralt's assertions, that he was only paid $90 per hour does not change this. As the government correctly points out, drug conspiracies need not involve monetary payments, only knowing participation. *See Powell*, 2017 WL 474343 at *14. And, in any case, Geralt admits he received thousands of dollars for his work at Compassionate. Nor does it matter that Geralt was not paid on a per patient or per prescription basis, or that others made much more from the conspiracy than he did. If the *only* evidence against Geralt was the receipt of relatively modest wages (for a doctor), we might question the conclusion that Geralt knew of and intended to assist the conspiracy.[8] As discussed above, however, the recordings, the testimony of Lovett, Myatt-Jones, Dr. Mitchell, and O'Connell, and Geralt's failure to be forthcoming when interviewed by the DEA all support the inference that Geralt was a voluntary participant in the ongoing conspiracy.

E.

Geralt next argues we should reverse his conviction because the jury was inappropriately allowed to "pil[e] inference upon inference." (Appellant's Br. at 27 (quoting *United States v. Sliwo*, 620 F.3d 630, 638 (6th Cir. 2010).) It is true that "[t]his Court has repeatedly held that participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy conviction under 21 U.S.C. § 846." *Sliwo*, 620 F. 3d at 633 (citations omitted). Thus, in *Sliwo*, we reversed the defendant's drug conspiracy conviction because although the government introduced evidence that the defendant agreed to transport a particular

---

[8] The government contends that Geralt's "relatively low documented income . . . was explained by the fact that the IRS agent [who testified] only located certain bank accounts and could not rule out payments from other sources, and could not trace cash payments." (Appellee's Br. at 15.) However plausible that theory may be, convictions are sustained by evidence, not theories, and there is no evidence Geralt received cash payments or any compensation beyond his hourly wage.

van and serve as a lookout, it did not present any evidence that the defendant knew the van contained marijuana. *Id.* at 633–34. Geralt's other cited cases are similar. *See United States v. Morrison*, 220 F. App'x 389, 395 (6th Cir. 2007) (reversing a drug conspiracy conviction because "the totality of th[e] evidence d[id] not prove beyond a reasonable doubt that Morrison had knowledge of hidden drugs (as opposed to any other contraband)"); *United States v. Coppin*, 1 F. App'x 283, 292 (6th Cir. 2001) (reversing a drug conspiracy conviction where the evidence showed that the defendant was present when a drug payment was received, but the nature of the transaction was not "readily apparent," the defendant had not been present when the drugs themselves changed hands, and the defendant's explanation for his presence was unrebutted).

This case is different from *Sliwo*, *Morrison*, and *Coppin* for at least two reasons. First, those cases involved cocaine or marijuana, whereas the conspiracy here involved prescription pain medication prescribed by a physician. "[K]nowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances." *Volkman*, 797 F.3d at 386 (quoting *Kanner*, 603 F.3d at 535). Dr. Mitchell testified there was no legitimate medical basis for Geralt's actions. On cross-examination Geralt attacked Dr. Mitchell's conclusions and his motivation as a paid government expert, but it was not unreasonable for the jury to credit Dr. Mitchell's opinion.

Second, in this case the evidence did not "merely . . . establish a climate of activity that reeks of something foul." *Coppin*, 1 F. App'x at 292 (alterations removed) (quoting *United States v. Wright*, 12 F.3d 215 (6th Cir. 1993) (table)). Rather, the recordings of Geralt telling Lovett what patients needed to say in order for him to prescribe OxyContin or Opana, changing a prescription at Lovett's request, and writing prescriptions for patients he never examined,

provide strong support for the inference that Geralt was aware of the "ultimate purpose" of the conspiracy, *Sliwo*, 620 F. 3d at 633—to obtain controlled substances for sale on the street.

**III.**

Geralt next asserts that the district court erred by not giving an entrapment instruction to the jury.

> A district judge's refusal to deliver an instruction is reversible error only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.
>
> An entrapment defense has two elements: (1) government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. A defendant is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment, but the defendant must provide enough evidence to support both elements of entrapment in order to receive the instruction.

*United States v. Demmler*, 655 F.3d 451, 456–57 (6th Cir. 2011) (alterations, internal quotation marks, citations, and footnotes omitted). The district court declined to give an entrapment instruction, stating that Geralt had not "presented anything or pointed to anything that satisfies the first or the second prerequisite of entrapment," i.e. inducement or predisposition. (R. 1458, PID 13940.) We agree that Geralt failed to meet his burden with respect to inducement, and therefore do not reach the other components of the inquiry.

"Our case law does not include an extensive definition of inducement." *United States v. Poulsen*, 655 F.3d 492, 502 n.3 (6th Cir. 2011). However, "[t]he government certainly may use undercover agents as an aid to law enforcement," *United States v. Harris*, 9 F.3d 493, 497 (6th Cir. 1993), and inducement "must be something more than 'merely afford[ing] an opportunity or facilities for the commission of the crime,'" *Poulsen*, 655 F.3d at 502 (quoting *Mathews v. United States*, 485 U.S. 58, 66 (1988)). Inducement "requires 'an opportunity *plus* something else—typically, excessive pressure by the government upon the defendant or the government's

taking advantage of an alternative, non-criminal type of motive.'" *United States v. Wilson*, 653 F. App'x 433, 439 (6th Cir. 2016) (emphasis in original) (quoting *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010)).

Geralt argues that he was induced to join the drug conspiracy because Lovett played on Geralt's sympathy for supposedly suffering patients and this, "in combination with Mr. Myatt-Jones['s] representations that he was a doctor who had already examined patients whose records were in the charts" was "too much for Dr. Geralt to overcome." (Appellant's Br. at 36–37.) In some cases, a "resort to sympathy" may support an inducement argument. *See Sherman v. United States*, 356 U.S. 369, 373 (1958). This argument fails here, though, for two reasons.

First, "[t]he defense of entrapment exists to thwart the government from 'originat[ing] a criminal design, implant[ing] in an innocent person's mind the disposition to commit a criminal act, and then induc[ing] commission of the crime so that the Government may prosecute." *Harris*, 9 F.3d at 497 (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)). Geralt's argument relies on statements Lovett and Myatt-Jones made to Geralt in early 2011. But Geralt joined Compassionate in the summer of 2010, and the state's database shows that he prescribed over 15,000 dosage units of OxyContin and Opana between June and December of that year. Geralt does not cite any evidence that the government induced him to do so, nor did he point to any below.

Second, even if we give Geralt the benefit of assuming that he did not actually participate in the conspiracy until his first recorded interaction with Lovett, he still would not have been entitled to an entrapment defense. Inducement requires "evidence of 'repeated and persistent solicitation,'" *Dixon*, 396 F. App'x at 186 (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932)), or "excessive pressure by the government," *Wilson*, 653 F. App'x at 439 (quoting

*Dixon*, 396 F. App'x at 186). For example, in *Sherman*, a series of meetings were necessary to overcome the defendant's "refusal, then his evasiveness, and then his hesitancy," before the government's confidential informant "achieve[d] capitulation." 356 U.S. at 373. And in *Jacobson*, the defendant was "the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations" offering child pornography. 503 U.S. at 550. By contrast, Lovett brought three patients to his first recorded meeting with Geralt, and Geralt prescribed narcotic pain medicine to all three after instructing Lovett as to what illness the patients needed to report to justify a prescription for the most potent pills. There is no evidence of repeated or persistent solicitation or excessive pressure or inducement.[9]

## IV.

Finally, Geralt argues the district court erred in determining the quantity of drugs attributable to him because the government's evidence is "too speculative and uncertain" to carry its burden. (Appellant's Br. at 48.) We disagree.

"A district court may not 'hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible.'" *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (emphasis in original) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). "A district court's drug-quantity determination is a factual finding that we review under the clearly erroneous standard. If the exact amount of drugs is undetermined, an estimate will suffice, but a preponderance of the evidence must support the estimate." *Id.* (citations omitted) (ellipses and quotation marks

---

[9] *United States v. Mayo*, 705 F.2d 62 (2d Cir. 1983), on which Geralt relies, is not to the contrary. After briefly laying out the relevant Second Circuit precedent, the court skipped over the inducement issue and decided the entrapment defense was not available on predisposition grounds. *Mayo*, 705 F.2d at 67–68 & n.4.

removed). "Clear error will not be found where two permissible views of the evidence exist, and a district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Id.* (citations omitted).[10]

Based on the state database and O'Connell's analysis, the presentence investigation report ("PSR") concluded that Geralt prescribed 81,210 30-milligram oxycodone pills, 8,950 80-milligram oxycodone pills, 685,292 hydrocodone pills, and 21,365 Opana pills between May 14, 2010, and January 14, 2013. Geralt prescribed other dosages of oxycodone, but since the street marketers had primarily sought the 80-milligram pills, then the 30-milligram pills, the other dosages were excluded from the report. The PSR also excluded, without explanation, all of the alprazolam and promethazine cough syrup with codeine. The PSR estimated that 90% of the listed prescriptions had been fraudulent, and recommended holding Geralt responsible for 73,089 30-milligram oxycodone pills, 8,055 80-milligram oxycodone pills, 616,762 hydrocodone pills, and 19,228 Opana pills, with a total estimated marijuana equivalent of 38,852 kilograms. The district court adopted this recommendation over Geralt's objection.

On appeal, Geralt contends that some of the prescriptions attributed to him may have been forgeries. He also asserts that the government's statistics "lack trustworthiness," (Appellant's Br. at 44), because the state prescription database depends on information reported by pharmacies, including those that participated in the conspiracy. At trial, Geralt sought to impeach O'Connell by eliciting testimony on these points. But Geralt does not cite any evidence of actual forgeries or misreported prescriptions, and we find none in the record. Thus, it was not

---

[10] The government contends we should apply plain error review because Geralt failed to raise below the specific arguments he makes on appeal. However, Geralt is not entitled to relief under either standard.

clear error for the district court to find that O'Connell's testimony and the state database accurately reflected the number and type of prescriptions written by Geralt.

Geralt also attacks the conclusion that 90% of his prescriptions were fraudulent as "speculative" and unsupported by "concrete" evidence. (Appellant's Br. at 47.) But district courts may estimate drug quantities for sentencing purposes. *Jeross*, 521 F.3d at 570. When a doctor violates the drug laws by writing fraudulent prescriptions, estimating the percentage of prescriptions written without a legitimate medical purpose may be required. *See United States v. Hogan*, 458 F. App'x 498, 503 (6th Cir. 2012). Here, the district court heard arguments from both sides about Geralt's prescription-writing practices while at Compassionate and Midwest. In adopting the 90% estimate, the district court concluded that the prescription statistics showed a continuing pattern of wrongful action. The district court also cited Geralt's "demonstrably false statements" when interviewed by authorities as evidence "that he realized what he was doing was wrong, and a violation of the physician's responsibility to patients as well as to the licensing authority." (R. 1463, PID 14369.) Those conclusions are permissible interpretations of the record evidence, and therefore the district court did not clearly err in determining that Geralt was more likely than not actually responsible for the drug quantities described in the PSR. *Jeross*, 521 F.3d at 570; *see Hogan*, 548 F. App'x at 503.

## V.

For these reasons, we **AFFIRM** Geralt's conviction and sentence.