**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0395n.06**

**Case No. 17-1918**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jul 10, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| SARDAR ASHRAFKHAN, | ) | |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

BEFORE: BOGGS, GRIFFIN, and READLER, Circuit Judges

BOGGS, Circuit Judge.

This appendix to the published opinion contains the court's decision on the remaining issues that the defendant, Sardar Ashrafkhan, has brought on appeal. Ashrafkhan was convicted of one count of conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 846; one count of healthcare-fraud conspiracy, 18 U.S.C. §§ 1347, 1349; and two counts of money laundering, 18 U.S.C. § 1957. His remaining arguments are: (1) objections to his jury instructions; (2) claims of prosecutorial misconduct; (3) claims of constructive amendment or prejudicial variance; (4) appeal of his Rule 29 motion for a judgment of acquittal based on insufficient evidence; and (5) various sentencing issues. For the following reasons, we affirm Ashrafkhan's conviction and sentence in full.

## I.  BACKGROUND

### A.  Factual Background

We begin by reciting the relevant facts in more detail.  Sardar Ashrafkhan was the owner of Compassionate Doctors ("Compassionate"), a medical clinic he established in 2006.  At trial, the government introduced evidence showing that Compassionate was a sham clinic that did not provide real medical care but was instead focused on writing fake prescriptions for individuals who were neither ill nor seeking healthcare.  These actions resulted in hundreds of thousands of opioid-based drugs being distributed onto the street, with Compassionate collecting millions of dollars from the fraudulent Medicare claims that it filed.

The scheme proceeded thusly: Compassionate would recruit associates whom they called "marketers"—generally small-time criminals or drug dealers—who would themselves recruit fake patients to the clinic.  These patients were not ill, nor did they seek any real healthcare from Compassionate.  Instead, the "patients" would obtain fraudulent prescriptions from Compassionate's doctors—some of whom were indicted and convicted alongside Ashrafkhan[1]— and Compassionate would then bill Medicare for these patient "visits."  According to testimony from trial, Compassionate would generally pay a marketer in cash or checks each time a fake patient that the marketer had recruited visited the clinic.

Compassionate marketers would also organize "patient parties," where numerous fake patients would gather at one location so that Compassionate doctors could write fraudulent prescriptions en masse.  The marketers would pay healthy individuals to attend these gatherings, and they would be informed that the sole purpose of the gathering was for fraudulent prescriptions

---

[1] We have recently affirmed the conviction and sentence of two of the doctors who worked at Compassionate and who were indicted as part of the same conspiracy.  *See United States v. Pamatmat*, 756 F. App'x 537 (6th Cir. 2018); *United States v. Geralt*, 682 F. App'x 394 (6th Cir. 2017).

to be written. Oftentimes, the "patient parties" would not even involve real doctors, and the prescriptions would instead be written by unlicensed medical school graduates on blank prescription forms that had been pre-signed by a licensed doctor working for Compassionate. Compassionate employees who attended the parties would also create fake patient charts and examination summaries to give the gatherings a semblance of legitimacy. For instance, each patient would usually receive two prescriptions, one for a controlled substance and one for a non-controlled maintenance medication such as a blood pressure or cholesterol drug so that the fraudulent pain prescriptions would appear more legitimate. Worse yet, after Compassionate doctors wrote the fake prescriptions, the clinic's marketers would fill the prescriptions and sell the drugs on the street, resulting in the distribution of millions of dollars' worth of opioids. According to the government, there was a tacit understanding that—in addition to the money that they were paid by Compassionate to recruit fake patients—the marketers would also profit from the resultant drug sales.

Although there was no indication that Ashrafkhan earned money from the drug sales on the street, he earned money through other illegal means. First, Compassionate would fraudulently bill Medicare for fake patient visits to the clinic. From January 1, 2007 to January 10, 2013, Compassionate filed 65,649 Medicare Part B claims for patient visits and related procedural care, claiming over $10 million in reimbursement, of which they were ultimately paid over $6.5 million. The government claims that almost all of that amount was fraudulent. Second, Ashrafkhan earned money through three associated home-healthcare companies that he also operated: Galaxy, Preferred, and Procare. Similar to Compassionate, these three companies ostensibly provided health services—through direct treatment at a patient's home—but the government alleged that they, too, engaged in Medicare fraud. Each company had a referral relationship with

Compassionate, wherein Compassionate would send fake patients to the company so that the "patient" could further obtain home therapies that he did not need. Compassionate would pay each marketer between $300 and $500 if the marketer could sign someone up for home healthcare, but the companies (and Ashrafkhan) benefited much more from the resultant fraudulent billing. Records from 2007 to 2013 showed that Ashrafkhan's home-healthcare companies billed Medicare for over $3.2 million during that period; $1,062,925.46 from Galaxy, $1,159,714.93 from Preferred, and $1,006,972.31 from Procare. The government alleged that most, if not all, of these claims were fraudulent. Third, Ashrafkhan also earned money through kickbacks paid by the pharmacies that Compassionate marketers used to fill the fraudulent prescriptions. Ashrafkhan would steer marketers to fill prescriptions at specific pharmacies that would then pay Ashrafkhan kickbacks to keep the prescriptions coming. Because the business was so profitable for the pharmacies, they effectively developed a bidding war in terms of the amount of money they would send to Ashrafkhan to keep the prescriptions coming.

## B. Procedural Background

Ashrafkhan was indicted on January 10, 2013, and was charged with one count of conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 846; one count of healthcare fraud conspiracy, 18 U.S.C. §§ 1347, 1349; and two counts of money laundering, 18 U.S.C. § 1957. Ashrafkhan's indictment also charged forty-three co-defendants. Only Ashrafkhan, along with Adelfo Pamatmat and John Geralt—two doctors employed by Compassionate—chose to go to trial.

At trial, the government attempted to show that Ashrafkhan had full knowledge of the illegal activities at Compassionate, and that he was the mastermind behind the scheme. Witnesses testified that Ashrafkhan would personally pay Compassionate's marketers in cash or checks, that

Ashrafkhan knew that his doctors prescribed the pain medication fraudulently, and that he would even encourage them to create fake patient charts or other documents to give Compassionate the semblance of legitimacy. The jury also heard testimony that Ashrafkhan would "run everything" at Compassionate, and that he was "the godfather" of the entire operation.

Ashrafkhan's attorneys argued at trial that he was completely unaware of any of the illegal activity at Compassionate and that much of the government's evidence at trial actually implicated a competing clinic, the Visiting Doctors of America ("VDA"), which was founded in early 2009 by a former Compassionate employee, Mohammed Ali Malik. For example, Ashrafkhan's defense noted that he had hired Malik to work at Compassionate in May of 2008, but that Malik worked there for less than a year before establishing VDA; and that much of the illegal activity—including the "patient parties"—were actually organized by VDA or individuals who had been with Compassionate but later left to join VDA. The defense claimed that for most of the time that Malik worked at Compassionate, Ashrafkhan was away on religious pilgrimages, and so any illegal activity traced to Compassionate during that period was because of Malik. Although the indictment implicated VDA as being engaged in part of the same drug-distribution and healthcare-fraud conspiracy as Compassionate (several individuals affiliated with VDA were also indicted) Ashrafkhan's defense at trial was that Compassionate was free of any wrongdoing, and that the true conspiracy centered on VDA. One of Ashrafkhan's main arguments on appeal is that, due to errors on the part of the district court, the evidence at trial tended to conflate the illegal activities of VDA with the legitimate activities at Compassionate.

The jury convicted Ashrafkhan of all charges. Following his conviction, Ashrafkhan filed a Rule 29 motion for a judgment of acquittal, arguing that there was insufficient evidence to support a conviction, but the district court rejected the motion, noting that there was more than

enough testimony at trial that the jury could have credited to return a conviction. Ashrafkhan's Presentence Report (PSR) computed his total offense level at forty-three. The guideline imprisonment range was life imprisonment, but the statutory maximum for his convictions was 600 months. Ashrafkhan was sentenced to an aggregate term of twenty-three years of imprisonment; 240 months for the drug-distribution conspiracy count, 120 months for the healthcare-fraud-conspiracy count—with 36 months to run consecutively and the remaining 84 months to run concurrently—and 120 months for the two money-laundering counts, to run concurrently.

Ashrafkhan timely appealed, making a variety of arguments that can be grouped into one of five general categories: (1) objections to his jury instructions; (2) claims of prosecutorial misconduct; (3) claims of constructive amendment or prejudicial variance; (4) appeal of his Rule 29 motion for a judgment of acquittal based on insufficient evidence; and (5) sentencing issues. We address each in turn.

## II. DISCUSSION

Ashrafkhan did not object to many of the alleged errors that he now presents on appeal in the proceedings below. Therefore, we will review these arguments for plain error. To succeed on plain-error review, Ashrafkhan will need to demonstrate that there was an "(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation and internal quotation marks omitted). Moreover, for an error to have substantially affected Ashrafkhan's rights, he must demonstrate that there is "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different."

*Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)).

## A. Jury Instructions

Ashrafkhan challenged three aspects of the jury instructions the district court gave at trial: (1) the language of the district court's reasonable-doubt instruction; (2) the decision to instruct the jury on the possibility of deliberate ignorance; and (3) the decision to not give, sua sponte, an instruction regarding the possible existence of multiple conspiracies. We held—in the published portion of this opinion—that the district court did not abuse its discretion in giving specific the reasonable-doubt instruction that it gave. Ashrafkhan never objected to the district court's deliberate-ignorance instruction at trial, nor did he request an instruction on multiple conspiracies. Because these arguments were not raised below, we review the district court's decisions for plain error. *See United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012).

### 1. Deliberate-Ignorance Instruction

Ashrafkhan argues that the district court should not have instructed the jury that it could find that he had knowledge of the illegal activities at Compassionate if he "deliberately ignored a high probability that material false and fraudulent statements were being made."[2] Ashrafkhan claims that a deliberate-ignorance instruction should not have been given in a prosecution focused mainly on charges of conspiracy because a conspiracy requires an agreement to commit illegal

---

[2] The complete instruction is as follows:

> No one can avoid responsibility for a crime by deliberately ignoring the obvious. Therefore, if you are convinced that a defendant deliberately ignored a high probability that material false and fraudulent statements were being made, then you may find that he knew those statements were being made. But to find this, you must be convinced beyond a reasonable doubt that the defendant you are considering was aware of a high probability that false and fraudulent statements were being made, and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict. This, once again, is all for you to decide.

This followed the Sixth Circuit's model jury instructions. *See* Sixth Circuit Pattern Criminal Jury Instructions 2.09.

activity that cannot be made if the defendant deliberately ignored such activity. However, Ashrafkhan's characterization of a conspiracy charge is inaccurate. To sustain a conviction on a conspiracy charge, "[t]he government need not show a formal written agreement; a simple understanding between the parties will suffice." *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004). Indeed, to be convicted of conspiracy, the defendant does not need to be very actively engaged in the scheme, but need only to "know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance." *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991) (citation omitted). We have thus approved of courts giving a deliberate-ignorance instruction in conspiracy cases. *See United States v. Mitchell*, 681 F.3d 867, 876–79 (6th Cir. 2012); *United States v. Myint*, 455 F. App'x 596, 604 (6th Cir. 2012).

A deliberate-ignorance instruction is appropriate when "(1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance." *Mitchell*, 681 F.3d at 876. Both parts are satisfied here. Ashrafkhan's defense at trial centered on his supposed lack of knowledge of the unlawful activities occurring at Compassionate. In opening statements, Ashrafkhan's counsel stated that "the trial is largely about state of mind" and that the evidence presented at trial would "take[] away the criminal state of mind [the government] are trying to convince you that [Ashrafkan] has." Despite this contention, there was more than enough evidence to "support an inference of deliberate ignorance." *Ibid.* One witness testified that Ashrafkhan personally directed unlicensed medical-school graduates to see patients, but then file claims as if the visits had been performed by a licensed doctor. When asked whether it would have been possible that Ashrafkhan did not know that the graduates were unlicensed or that the claims were billed incorrectly, the witness stated that Ashrafkhan "directed us to do it like this" and that he would personally interview potential hires at Compassionate so there was no way that he did

not know each employee's medical background. The witness further explained that Ashrafkhan would show employees how to fill out the billing forms, and that he told them the goal of the billing was "to get as much money as you can from the patient's insurance company, which was Medicare." Another witness testified that Ashrafkhan would pay marketers for signing up patients, and that he knew the marketers would fill the prescriptions and later sell the drugs on the street. These examples show that there was at least an inference to support Ashrafkhan's deliberate ignorance of the healthcare fraud, if not outright knowledge of it. The district court thus did not err in giving a deliberate-ignorance instruction.

### 2. Failure to Give an Instruction on Multiple Conspiracies

Ashrafkhan's last challenge to the jury instructions involves an instruction that the district court did not give. According to Ashrafkhan, evidence at trial showed the existence of multiple conspiracies, all of which centered on VDA rather than Compassionate. He claims that many of the government's cooperating witnesses at trial were former VDA employees, and that their testimony either intentionally or negligently conflated much of the illegal activity they performed at VDA with the legal activities they did while at Compassionate. Even though at trial the government had suggested that VDA and Compassionate were involved in the same conspiracy (and indeed, several individuals who had worked with both clinics were charged in the indictment), Ashrafkhan argues that the district court's decision not to give a multiple-conspiracies instruction unfairly prejudiced him by allowing the jury to convict him for crimes that were not committed at Compassionate. *See* Sixth Circuit Pattern Criminal Jury Instructions 3.08.

On plain-error review for a failure to give a multiple-conspiracies instruction, the defendant "can prevail only if he shows that the evidence presented could 'reasonably be construed *only* as supporting a finding of multiple conspiracies' rather than the conspiracy charged." *United States*

*v. Rugiero*, 20 F.3d 1387, 1391 (6th Cir. 1994) (citation omitted); *see also* Sixth Circuit Pattern Criminal Jury Instructions, Committee Commentary 3.08 (collecting cases for the proposition that "[w]hen no evidence is presented warranting an instruction on multiple conspiracies, none need be given"). Ashrafkhan cannot meet this burden because, at trial, he never argued that there were multiple conspiracies but argued instead that he did not participate in *any* conspiracy. On appeal, he provides no explanation for how a separate conspiracy existed or why the government's theory that VDA and Compassionate were part of the same conspiracy was incorrect. "[A] single conspiracy is not converted into multiple conspiracies merely because there may be some changes in persons involved or because they play different roles." *Rugiero*, 20 F.3d at 1391. The district court was thus not required to give a multiple-conspiracies instruction where only one conspiracy is alleged and proven at trial. *See United States v. Lash*, 937 F.2d 1077, 1086 (6th Cir. 1991).

### B. Alleged Prosecutorial Misconduct

Ashrafkhan next makes two arguments alleging prosecutorial misconduct both before and during his trial. First, he argues that prosecutors impermissibly steered his case towards a district judge of their choosing by manipulating the circumstances surrounding the indictment. Second, he argues that the prosecutors knowingly elicited false testimony from witnesses at trial. Ashrafkhan never raised either of these arguments before the district court, so we review for plain error. *See United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008).

### 1. Trial-Judge Selection

Ashrafkhan first contends that the prosecution manipulated the selection of the trial judge so that his case would be assigned to Judge Cleland, an act of improper prosecutorial "steering." In support, he details the following series of events. In September 2011, the government brought an indictment against ten defendants—which did not include Ashrafkhan—alleging a conspiracy

to distribute OxyContin. After Judge Cleland was assigned to the case, the government brought a first superseding indictment against one new defendant, Frederick Jackson. Ashrafkhan alleges that this superseding indictment had "no connection between Jackson and the original defendants," from the September 2011 indictment. Moreover, by the time that Jackson was indicted, the ten original defendants had all already pleaded guilty. Finally, on January 10, 2013, the government brought a second superseding indictment against Ashrafkhan and forty-three co-defendants (one of which was Jackson), even though Ashrafkhan claims that there was no connection between any of the new defendants and Jackson, nor any connection between the new defendants and the ten defendants from the original indictment. In short, Ashrafkhan claims that prosecutors charged multiple individuals in several, unconnected indictments because they preferred Judge Cleland to preside over the proceedings. Ashrafkhan claims that these actions violated the district court's case-assignment plan under the local rules of the Eastern District of Michigan, and that it deprived him of due process. *See* E.D. Mich. LCrR 57.10(a).

First, it is important to note that the second superseding indictment, the indictment which charged Ashrafkhan, did *not* violate any local rule of the Eastern District of Michigan. Although the current version of Rule 57.10 states that "[s]uperseding indictments and informations shall not be filed in closed cases or cases where the last defendant has pleaded guilty and is awaiting sentencing," that provision was not part of the rule when Ashrafkhan was charged in January of 2013. *See* E.D. Mich. LCrR 57.10(d)(3). The current version of the rule was proposed for amendment in December of 2013, and only took effect in June of 2014. *See* Notice of Proposed Amendment to Local Rules, https://www.mied.uscourts.gov/PDFFIles/DEC2013Propo sedAmendments.pdf (last visited July 9, 2020). In any event, Ashrafkhan only discusses this local rule in reference to the *first* superseding indictment, which charged Frederick Jackson after the ten

defendants in the original September 2011 indictment had already pleaded guilty. Ashrafkhan does not (nor could he) contend that the second superseding indictment charging him had the same defect, because Jackson did not plead guilty before the second superseding indictment was filed. And although Ashrafkhan claims that there was no connection between himself or Frederick Jackson, trial testimony showed that Jackson was a marketer who had worked with Compassionate.

However, just because the government complied with the local rules does not necessarily render its actions immune from due-process review. But contrary to Ashrafkhan's insistence that the government engaged in impermissible "judge shopping," no court has ever held that prosecutorial "judge shopping"—without more—is a per se violation of a defendant's due-process rights. *See Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) (holding that "no federal court has held that prosecutorial judge shopping is a *per se* basis for habeas relief" and collecting cases); *United States v. Pearson*, 203 F.3d 1243, 1266 (10th Cir. 2000) (noting "that a certain type of judge-shopping inheres in our federalist system" and that the most important question was simply whether the judge assigned was impartial); *Tyson v. Trigg*, 50 F.3d 436, 442 (7th Cir. 1995) (holding that allowing a prosecutor to choose the trial judge, even if it "lack[s] the appearance of impartiality" is not enough to grant a new trial).

We have also spoken on this issue, although briefly, in two cases. In *Sinito v. United States*, 750 F.2d 512 (6th Cir. 1984), the defendant claimed that he was entitled to a new trial because his case had been "steered" to a particular judge. The judge was assigned according to the local rules of the Northern District of Ohio at the time, which had a case-assignment plan that allowed a "district court judge sitting in Akron [to] exchange a non-Akron case initially assigned to him for an Akron case of the same category initially assigned to a judge sitting in Cleveland, thus facilitating the hearing of Akron cases by a judge in Akron and non-Akron cases by a judge sitting

in Cleveland." *Id.* at 514 n.3. Sinito's case had been randomly assigned to a Cleveland-based judge, but pursuant to the case-assignment plan, it was reassigned to an Akron-based judge, Judge Manos. Sinito argued that a clerical error in a previously filed case resulted in Judge Manos being assigned rather than a different Akron judge.

We ultimately rejected Sinito's claim, holding that "[e]ven when there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with local rules, the defendant is not denied due process as a result of the error *unless he can point to some resulting prejudice*." *Id*. at 515 (emphasis added). This is because the rules "governing the assignment of cases are designed as internal housekeeping rules to promote the efficient operation of the district courts; they are not meant to confer rights on litigants." *Ibid.* As such, a defendant alleging an improper judge assignment must claim that the assigned judge was prejudicial. Sinito never claimed any prejudice by his trial judge, and so we affirmed his conviction. *Id*. at 516. One year after *Sinito*, we evaluated another allegation of prosecutorial judge steering in *United v. Gallo*, 763 F.2d 1504 (6th Cir. 1985). Gallo was a co-defendant of Sinito's, and he made the same argument on appeal. Our disposition of the issue was the same, and we cited *Sinito* approvingly for the proposition that "a pattern of 'steering' significant criminal cases to a judge of [the prosecution's] choice" does not implicate any due process concerns unless the defendant can raise a particular claim of impartiality to the specific trial judge assigned. *Id*. at 1532.

Similar to the defendants in *Sinito* and *Gallo*, Ashrafkhan never establishes—or even alleges—that Judge Cleland behaved prejudicially in any way. He therefore cannot prevail on this issue.

## 2. Evidentiary Issues

Ashrafkhan also contends that his conviction should be overturned because the government intentionally introduced two pieces of evidence and testimony that it knew were false: (1) a "summary chart" of Compassionate patient files; and (2) the testimony of a former Compassionate marketer, Tiffany Walker.

"The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). To reverse a conviction, the defendant "must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Ibid*. Importantly, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony," and a defendant will not prevail unless he can demonstrate that the testimony was "*indisputably false*." *Id*. at 822, 823 (emphasis added); *see also Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (noting that defendants' claims rarely succeed "because of the difficulty in proving that the Government's witness 'testified in an indisputably false manner'" (citation omitted)).

At trial, the government introduced a summary chart of patient "visits" to Compassionate. The chart showed the information of patients who had supposedly visited Compassionate, such as the procedure performed and the date of the visit. However, the government argued that several cooperating witnesses whose information were on the chart stated that they had never actually been examined by licensed doctors or visited Compassionate on the dates listed. Witnesses testified that the chart showed that numerous patient files had been improperly inserted into Compassionate's files and fraudulently billed to Medicare through a process called "back-billing," wherein Compassionate would insert a patient's name into its billing system on a specific date, but

would then "back-bill" that "visit" to an earlier date. Because of the way Medicare claims were processed, the claims were not received until generally a week later, and witnesses stated that this method was done to falsely increase the time between the alleged fraudulent visit and when Medicare would actually be billed so that Compassionate could avoid detection. Ashrafkhan claims that the chart and the accompanying testimony were misleading because a defense witness testified that, in his view, the chart did not show any fraudulent billing. But this piece of testimony, alone, does not establish that the chart was "indisputably false." It merely represented a different view of the evidence that the jury apparently did not accept. Ashrafkhan does not provide any additional reason for why the chart was false and thus his claim is foreclosed on this issue.

Next, Ashrafkhan objects to the testimony of Tiffany Walker, a Compassionate marketer who testified that several of her sign-in sheets from "patient parties" were signed in June, July, and August of 2009 by Dr. Faraj Ghabag, a Compassionate doctor who had not actually seen the patients. Ashrafkhan claims that Dr. Ghabag stopped working at Compassionate in April of 2009, and that by the dates testified to at trial, he had begun working at VDA. Ashrafkhan suggests that the government intentionally misled the jury in an attempt to conflate VDA's activities with Compassionate's. However, similar to the summary-chart argument, this argument is unpersuasive because Ashrafkhan cannot demonstrate that Walker's testimony was "indisputably false." Ashrafkhan provides no evidence to clearly show that Dr. Ghabag did not work at Compassionate during the summer of 2009. At trial, Walker testified that it was her "understanding" that Dr. Ghabag—who was primarily working under Ali Malik—was still with Compassionate at the time that he signed the forms. And although Ghabag could have transitioned to working at VDA at the time, she did not know "exactly what time [Malik] moved all the way over there" and so she could not be sure when Ghabag transitioned either. Ashrafkhan contends

that the government knew that the testimony it elicited from Walker was misleading because Ghabag gave an interview to the FBI years after the trial in which he apparently stated that he had left Compassionate by June of 2009. However, Ashrafkhan offers no reason why an unsworn interview that occurred years after the events testified to renders Walker's testimony "indisputably false." We hold that there are no evidentiary issues that require us to vacate his conviction.

## C. Constructive Amendment or Prejudicial Variance

Ashrafkhan next argues that the government constructively amended his indictment or, in the alternative, that it caused a prejudicial variance. "A constructive amendment 'results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment.'" *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008) (citation omitted). A constructive amendment is per se prejudicial because the defendant will have been convicted of a crime with which he was never charged. In contrast, a variance "occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Ibid.* (alteration in original) (citation omitted). A reversal of a conviction based on a variance "is warranted only where a defendant proves that (1) a variance occurred and (2) that the variance affected a substantial right." *Ibid.*

Ashrafkhan claims that the indictment that charged him alleged a large drug-distribution conspiracy, involving multiple different clinics and defendants who participated at different times and played different roles within the overall scheme. However, at trial, the government introduced evidence to prove only a limited conspiracy that focused mainly on Compassionate. Ashrafkhan argues that this was impermissible, creating a situation in which there was a gap between what was

alleged in the indictment and what was proven at trial. Generally, whether there is a constructive amendment or variance is an issue of law reviewed de novo, but as with most of his other claims, because Ashrafkhan did not raise this argument below, we review it for plain error. *Id*. at 682.

A constructive amendment occurs only if the defendant is convicted of a crime other than the one charged in the indictment. There is no constructive amendment where the evidence and jury instructions simply provide an "alternative method" of proving the charged offense. *United States v. Suarez*, 263 F.3d 468, 478 (6th Cir. 2001). We have thus held that there is no constructive amendment where the indictment alleges two different methods of how the offense was committed even if the evidence at trial proved only one of those two methods. *See United States v. Budd*, 496 F.3d 517, 526 (6th Cir. 2007). Here, an evaluation of the indictment demonstrates that Ashrafkhan was not convicted of a crime with which he was never charged. Count One of the indictment alleges that Ashrafkhan, along with several co-defendants, knowingly agreed to "intentionally and unlawfully distribute and possess with intent to distribute controlled substances, including but not limited to" OxyContin, Vicodin, Vicodin ES, Lortab, Xanax, and cough syrup with codeine. Count Two states, in relevant part, that Ashrafkhan, along with co-defendants, conspired to "enrich themselves by, among other things, (a) submitting false and fraudulent claims to Medicare . . . (b) offering and paying kickbacks and bribes to Medicare and Medicaid beneficiaries . . . (c) soliciting and receiving kickbacks and bribes . . . (d) concealing the submission of false and fraudulent claims to Medicare . . . and (e) diverting proceeds of the fraud for the personal use . . . ." The two money-laundering counts (Counts Nine and Ten of the indictment) similarly described general conduct—that Ashrafkhan withdrew funds in two amounts, $80,353.23 and $150,000—in cashier's checks. The jury heard evidence that matched these allegations, including testimony from individuals that discussed how Compassionate's scheme resulted in the distribution of drugs like Oxycontin onto

the street, and how Ashrafkhan and his associates would recruit individuals to bring in fake patients to the clinic. Ashrafkhan makes no more than a conclusory assertion that the evidence at trial differed from what was charged in the indictment. There was thus no constructive amendment.

There was also no variance. Ashrafkhan argues that the indictment charged only one single conspiracy involving Compassionate, but that the evidence at trial showed the existence of multiple conspiracies all centering on VDA instead of Compassionate. This argument is unpersuasive. Although the indictment charged one conspiracy, it included VDA as part of that conspiracy. And although some of the testimony at trial referenced VDA, that does not necessarily mean that there were multiple conspiracies, because the conspiracy charged in the indictment involved several different levels of conspirators, including clinics, doctors, pharmacists, and marketers. A variance exists only when "an indictment alleges one conspiracy, but the evidence can be construed as *only* supporting a finding of multiple conspiracies." *United States v. Lee*, 991 F.2d 343, 349 (6th Cir. 1993) (emphasis added). Ashrafkhan makes no argument as to why the evidence supports a finding of *only* multiple conspiracies. Indeed, the opposite is true, as the evidence showed that several individuals worked at both Compassionate and VDA, and that there were more than a few minor interactions between the two organizations. Thus, there was no variance—let alone a prejudicial one—that would warrant a reversal of Ashrafkhan's conviction.

### D. Rule 29 Motion for Judgment of Acquittal

Following trial, Ashrafkhan filed a Rule 29 motion for a judgment of acquittal, arguing that there was insufficient evidence to support his convictions. The district court denied the motion. We review sufficiency-of-the-evidence claims de novo, *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014), and "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "In deciding a motion for judgment of acquittal, neither the district court nor the court of appeals may make independent determinations regarding the credibility of witnesses or the weight to be given such evidence," and "the Government must be given the benefit of all reasonable inferences drawn from the evidence, including circumstantial evidence." *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992).

The trial record establishes that the jury could have credited trial testimony to conclude that Ashrafkhan knew of, and indeed supervised, much of the illegal activity at Compassionate. The jury heard testimony that Ashrafkhan was the "godfather" of the entire drug-distribution conspiracy, and that he "r[a]n everything." Verdell Lovett, a Compassionate marketer, testified he and Ashrafkhan directly discussed "money" and how much Ashrafkhan was going to pay him "for getting these patients signed up" for Ashrafkhan's home-healthcare services. Lovett also testified that he and Ashrafkhan had a conversation where Ashrafkhan expressed reluctance at paying Lovett for signing up more patients, because "he said that the patients, all of them are getting OxyContin, so why should I pay you [Lovett] any additional money when you know you're making money off the patients for OxyContins." Lovett also testified that he believed there was no way that Ashrafkhan did not know that he was selling Oxycontin on the street and that he was profiting from such sales.

Another witness, Mahmoud Fardous, testified that he consistently paid Ashrafkhan kickbacks for referring patients to Fardous's pharmacy. He stated that he paid Ashrafkhan the kickback—or, as Fardous called it, "a gift"—"based on [the] number of prescription[s] we had filled from Dr. Khan's practice." Ashrafkhan would "call us every three weeks, ask for the gift. And I [would] send my technician over to pay the cash." Although Fardous never personally

delivered the money to Ashrafkhan, he testified that "Dr. Khan was the person in charge of calling the pharmacy and remind[ing] us about the gift. Since he never showed any dissatisfaction, I assumed the money was there." Yet another witness, Dr. Ravi Iyer, testified that Ashrafkhan told him to write prescriptions for Oxycontin for patients who never visited the clinic and to sign blank prescription pads to be later used at "patient parties." Ashrafkhan also apparently "embraced" the idea of altering the patient visit charts to make them appear more legitimate. Finally, when Iyer told Ashrafkhan that he no longer wanted to participate in the "patient parties" because "we're not doing any real medicine out here," Ashrafkhan apparently responded by directing Iyer to no longer see patients but to simply sign off on fraudulent patient charts instead.

In sum, the jury could have credited any of these witnesses' testimony to convict Ashrafkhan, and the district court properly incorporated much of this testimony into its order denying Ashrafkhan's Rule 29 motion. Notably, on appeal, Ashrafkhan does not contest the *existence* of a drug-distribution or healthcare-fraud conspiracy. He merely contests his *knowledge* of the illegal activities. Given the evidence presented, and the highly deferential standard for a sufficiency-of-the-evidence review, we affirm the district court's denial of the motion for acquittal.[3]

### E. Sentencing

Finally, Ashrafkhan argues that even if he is not granted a retrial, he is still entitled to a remand for resentencing based on three errors. First, he argues that the district court improperly concluded that he had caused drug overdose deaths in Portsmouth, Ohio. Second, he argues that the district court erred in improperly computing the amount of drugs attributable to him. Third,

---

[3] Ashrafkhan also claims that we should reverse his convictions for money laundering because of insufficient evidence but acknowledges that the money-laundering counts rely on the drug-distribution and healthcare-fraud counts as predicate acts. Thus, since we hold that there was sufficient evidence to affirm the conviction on the fraud charges, we also affirm Ashrafkhan's money-laundering convictions.

he argues that the district court improperly computed the loss amount attributable to him. For the reasons that follow, we reject these arguments and affirm Ashrafkhan's sentence in full.

### 1. "Portsmouth, Ohio" Comment

During Ashrafkhan's sentencing hearing, Judge Cleland—after making the necessary sentencing computations—made the following comment:

> Taking into account the seriousness of the offense conduct in which both the defense and the Government have acknowledged is extraordinarily serious. It is behavior that has led to addiction and multiple deaths from overdose in the Portsmouth, Ohio area.

Ashrafkhan argues that this comment violated Federal Rule of Criminal Procedure 32(d), which requires that any factor relevant to sentencing to be included in the Presentence Report. Fed. R. Crim. P. 32(d)(1). Pursuant to *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), Judge Cleland, after pronouncing Ashrafkhan's sentence, asked if there were any objections to the sentence or the hearing that had not previously been raised. Ashrafkhan did not further object and thus we review the comment for plain error. We find no error because the comment is ambiguous as to whether it expresses Judge Cleland's view of Ashrafkhan's conduct or whether it references the "offense conduct" of drug distribution more generally. For instance, the PSR detailed effects of the opioid epidemic in Portsmouth, stating that many of the drugs obtained through Ashrafkhan's healthcare fraud were "illegally distributed for substantial profit on the street through a network of individuals in Portsmouth, Ohio, and elsewhere." Earlier in the hearing, Judge Cleland also discussed Portsmouth in relation to "the effects on the community of the dispensation of the pills, particularly the controlled substance opiate pills." He explained that "[t]he presentence report totals those up into the hundreds of thousands of OxyContin or Oxycodone pills and the millions of the other pills as the Court knows from sentencings of other individuals that traveled to Portsmouth, Ohio and impacted so negatively the folks there." Thus, the comment about

Portsmouth was based on reasonable assumptions—given the attention around Portsmouth's opioid epidemic and the conclusions of the PSR—that some of the drugs from the conspiracy may have been distributed in that area. Given this backdrop, the comment did not amount to any sort of prejudicial error.

### 2. Drug-Amount Calculation

Ashrafkhan next challenges the district court's determination of the drug-quantity amount attributable to his conduct. "A district court's drug-quantity determination is a factual finding that we review under the clearly erroneous standard." *See, e.g.*, *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). "If the exact amount of drugs is undetermined, 'an estimate will suffice, but . . . a preponderance of the evidence must support the estimate.'" *Ibid.* (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)).

The district court adopted the PSR's determination that approximately 90% of the prescriptions written by several Compassionate doctors were fraudulent and should be attributed to Ashrafkhan. This resulted in Ashrafkhan being assigned responsibility for the illegal distribution of hundreds of thousands of doses of controlled substances, and a four-level increase to his offense level. Ashrafkhan objects on two grounds: (1) that the information used to determine how many drugs were prescribed was inaccurate, and (2) that the 90% attribution rate is arbitrary and not supported by evidence.

The government used data from the Michigan Automatic Prescription Service (MAPS)—a database that lists the prescribing doctor and the dosage of each controlled-substance prescription filled by Michigan pharmacies—to calculate the amount of drugs that had been prescribed by Compassionate doctors. Ashrafkhan argues that the MAPS data is unreliable because it did not have the most accurate dates of when each prescribing doctor was affiliated with Compassionate,

and that some of the doctors that MAPS detailed as working for Compassionate may have already left the clinic by the date listed. He also makes the conclusory assertion that some of the prescriptions detailed in the database were forgeries. These allegations, without more, are insufficient to establish that the MAPS data was unreliable. In two prior cases involving the Compassionate conspiracy, we have affirmed the reliability of the MAPS data to support sentencing determinations. *See United States v. Pamatmat*, 756 F. App'x 537, 550 (6th Cir. 2018); *United States v. Geralt*, 682 F. App'x 394, 407 (6th Cir. 2017). The defendants in both cases objected to the use of the MAPS data on the same basis as Ashrafkhan does now—that the data was speculative and could have included possible forgeries—but we held that there was no evidence to support these allegations, and Ashrafkhan offers us no reason to conclude that his objection should be adjudicated any differently.

Ashrafkhan also insists that the conclusion that 90% of the prescriptions from Compassionate were fraudulent is speculative and should be reconsidered. But we considered and rejected this argument, too, in *Pamatmat* and *Geralt*. *See Pamatmat*, 756 F. App'x at 551; *Geralt*, 682 F. App'x at 407. More specifically, two key pieces of evidence presented at trial—and considered by the district court in rejecting Ashrafkhan's original objection—foreclose this argument. First, one of Compassionate's doctors, Dr. Iyer, testified that he estimated that only about five percent of the clinic's patients were legitimate. Based on this testimony, the PSR made the conservative estimate—by doubling Iyer's estimated amount—that ten percent of Compassionate's activities were legitimate, arriving at the 90% attribution rate for Ashrafkhan. Second, trial testimony revealed that *all* of the government's undercover patient visits to the clinic were fraudulent. Similar to the defendants in *Pamatmat* and *Geralt*, Ashrafkhan offers no

persuasive reason as to why the 90% estimate is erroneous. Thus, we affirm the drug-quantity determination.

### 3. Loss-Amount Calculation

Ashrafkhan also argues that the district court erred in determining the fraud-loss amount that was attributable to him. A district court's fraud-loss calculation is reviewed for clear error, while its methodology is reviewed de novo. *See United States v. Meda*, 812 F.3d 502, 519 (6th Cir. 2015); *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009). Similar to the drug-quantity calculation, we "ask whether a preponderance of the evidence supports the district court's determination of loss" and we "affirm if the district court made a 'reasonable estimate of actual or intended loss within broad ranges.'" *Pamatmat*, 756 F. App'x at 551 (quoting *United States v. Howley*, 707 F.3d 574, 583 (6th Cir. 2013)).

The PSR established that Ashrafkhan was responsible for a loss amount of $9,131,689.29. This was totaled from: $6,557,862.88 that Compassionate received from Medicare, later reduced to $5,902,076.59 based on a 10% reduction for potential legitimate claims, and $3,229,612.70 for the total amount that Ashrafkhan's home-healthcare services received from Medicare: $1,062,925.46, $1,159,714.93, and $1,006,972.31 from Galaxy, Preferred, and Procare, respectively. Because the fraud-loss amount was over $7,000,000, a three-level increase was applied to Ashrafkhan's offense level. Ashrafkhan objects to the $9,131,689.29 amount, contending that the district court erred when it added Medicare payments made to his home-healthcare services to the overall loss amount. He contends that the amount attributable to these companies should have been reduced to account for potentially legitimate claims, similar to how the loss amount attributable to Compassionate was reduced by 10%.

Although it is difficult to conclude definitively that all of the Medicare billing from Ashrafkhan's home-healthcare companies were fraudulent, the district court needed only to conclude that Ashrafkhan's total loss amount was over $7 million to have arrived at the same offense level. Because Ashrafkhan does not object to the loss-amount calculation attributable to Compassionate—$5,902,076.59—the same offense level was justified if the district court could conclude that a *total* of at least $1,097,923.41 could be attributed to Ashrafkhan from the fraud at all three home-healthcare services, combined. Put simply, to have reached the same offense level, the district court only needed to find that at least 34% of the approximately $3.2 million in Medicare payments received by Ashrafkhan's home-healthcare services were fraudulent.

There is ample evidence to establish this by a preponderance of the evidence. For example, Verdell Lovett, a Compassionate marketer, testified that "the doctor visits [for the home-healthcare services] weren't even real" and that the patients "didn't require therapy at all." He further explained that many of the patients who he signed up for the home treatments were not "homebound"—as they needed to be for Medicare eligibility—and that in reality, "[n]one of them needed therapy" but "were getting paid for" just for signing up. The discussions with Ashrafkhan focused on "[h]ow much was he going to pay me for getting these patients signed up" and that the "process" involved signing the patients up with Galaxy—one of Ashrafkhan's home-healthcare services. Other witnesses also corroborated this series of events, and one witness even stated that it was "policy" that *every* patient who received pain medication from Compassionate would also sign up for home physical therapy with one of Ashrafkhan's home-healthcare services. Against this backdrop, the district court did not err in determining Ashrafkhan's loss amount.

\* \* \*

For the foregoing reasons, we AFFIRM Ashrafkhan's conviction and sentence.